**FN MANUFACTURING, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**Colt's Manufacturing Company, Inc., Intervenor.**

No. 98–447 C.

United States Court of Federal Claims.

Oct. 28, 1998.

Richard C. Johnson, David A. Handzo, Kevin M. Kordziel, and Sidney A. Rosenzweig, Jenner & Block, Washington, D.C., for plaintiff.

Lance J. Lerman, with whom were Assistant Attorney Frank W. Hunger, Director David M. Cohen, and Anthony H. Anikeeff, Department of Justice, Washington, D.C., for defendant. Vera Meza, United States Army Material Command, and Maria Bribriesco, United States Army Armament and Chemical Acquisition and Logistics Activity, of counsel.

Michael A. Hordell and Laura L. Hoffman, Gadsby & Hannah, LLP, for intervenor.

### REDACTED

WIESE, Judge.

### *RULING ON LAW*

This is a suit for declaratory and injunctive relief. Plaintiff, FN Manufacturing, Inc. (FNMI), the domestic subsidiary of a European arms manufacturer, is asking the court to declare illegal, and to enjoin the Government from continuing with performance under, a sole-source contract awarded to Colt's Manufacturing Company, Inc. (Colt's), the intervenor here, on May 5, 1998. The challenged award involves the manufacture of a quantity of M4/M4A1 carbines—the successor weapon to the M16 rifle currently in use by the United States Army and North Atlantic Treaty Organization ground forces. FNMI is one of the Government's principal manufacturing supply sources for the M16 rifle.

This is the third time this case has come before the court. In the first round of the litigation, we addressed the contention, advanced by both the defendant and the intervenor, that FNMI lacked standing to protest the sole-source award to Colt's because it had failed to submit a timely bid. We rejected the contention, holding that the timeliness of a bid was to be measured from the date notice of the solicitation appeared in the

printed version of the Commerce Business Daily as opposed to the date of its posting on the Internet. 41 Fed.Cl. 186 (Order Denying Intervenor's Motion To Dismiss, filed June 30, 1998).

Following the ruling on the timeliness of plaintiff's bid, we next took up the question of whether FNMI's response to the solicitation was sufficient to have demonstrated to the procuring agency—the Army Armament and Chemical Acquisition and Logistics Activity (ACALA)—the need to reexamine the validity of its decision to proceed with procurement of the M4 carbine on a sole-source basis.

The court resolved this issue in the Government's favor. In a bench ruling entered on July 2, 1998, the court explained that in a case such as this, where the sole-source procurement is based on the Government's informed judgment that the planned procurement involves technology that is exclusive to a named source, the potential competitor must demonstrate either that (i) the technology involved is not exclusive or, if exclusive, (ii) is susceptible to duplication by the potential competitor within the time constraints demanded by the proposed procurement.

Based on an examination of FNMI's response to the solicitation, the court concluded that the unsolicited proposal that FNMI submitted to the Government on May 5, 1998, did not supply the information that the Government would need in order to justify a decision abandoning the planned sole-source procurement in favor of a competitive procurement. Specifically, while that proposal clearly identified FNMI as a qualified small-arms manufacturer with substantial experience in Government procurements, including, in particular, experience in the manufacture of the closely related weapon, the M16, it failed to demonstrate any first-hand knowledge of the weapon system at issue—the M4/M4A1 carbine. Rather, the proposal acknowledged that the company's familiarity with the M4/M4A1 was confined to "technical information FNMI has been able to obtain through public documents (marketing brochures, data sheets and field involvement)."

We turn now to the issue of current concern. In the interest of seeking an expeditious resolution of this controversy, the parties have asked the court to rule on the following question: whether the Government, in the settlement of a contract dispute, is free to relinquish rights in technical data, if by doing so, it disables itself from competitively conducting future procurements involving the use and application of the relinquished data. Put another way, does a contracting agency have the authority to agree to a contract settlement that establishes a contractor's exclusive ownership of technical data, thereby restricting all future procurements involving the data to sole-source purchases?

### *Facts*

On June 30, 1967, Colt's entered into a technical data and patent license agreement with the Government, affording the Army limited rights to the M16 rifle and the XM177 submachine gun. Under the terms of this license, the Army was permitted to release the technical data package (TDP) for use in competitive procurements involving the acquisition of the M16 and its component parts, subject to the limitation that the manufacture be carried out in the United States.

Subsequent to the signing of the M16 licensing agreement, Colt's developed the M4 and M4A1 carbines, weapons derived from, and sharing a majority of their parts with, the M16 rifle. While the parties do not agree to what extent—if at all—the Government contributed financially to the development of the M4 and M4A1, it is clear that Colt's committed its own funds to the project. In a letter dated March 5, 1985, Colt's informed the Army that, based on the fact that the M4 and M4A1 were derived from the M16, Colt's considered the M4 and M4A1 to be covered by the 1967 Licensing Agreement. The Government did not challenge that assertion.

In January 1996, an Army engineer authorized the release of the M4A1 TDP to the Navy. The Navy, unaware of the terms of the 1967 Licensing Agreement, used the TDP in conjunction with an advertised solici-

tation for M4A1 adapters,[1] thereby improperly disclosing the TDP to some 21 contractors, including FNMI. This disclosure was improper for several reasons, including the fact that it did not relate to an authorized use (the solicitation at issue did not involve the procurement of a weapon or a weapon component) and the information was disseminated without obtaining required non-disclosure statements from the participating contractors. Upon learning of the solicitation, Colt's notified the Government on December 26, 1996, that it had violated the 1967 Licensing Agreement by failing adequately to protect Colt's proprietary data. And, because it believed the breach to be material, Colt's further advised the Government that the licensing agreement was terminated and that the Government would no longer be permitted to use the data in the procurement or manufacture of the M16, M16A1, XM177, XM177E2, M4 or M4A1.

The Government responded to Colt's letter on February 14, 1997. In its reply, the Government acknowledged that Colt's might in fact be entitled to damages because of the unauthorized release, but disputed that the licensing agreement had been materially breached. Relying on Article XX of the licensing agreement, the Government asserted that a breach would arise—and termination would be appropriate—only in the event that the Government failed to use its best efforts to remedy the violation. Because it had presumably corrected its error by recovering all copies of the TDP from the Navy and by securing non-disclosure statements from 19 of the 20 contractors (with FNMI, the lone hold-out, providing a letter attesting that it had not improperly used the data), the Government maintained that it had met its obligation under the licensing agreement, and that the 1967 Licensing Agreement therefore remained intact.

An investigation of the incident by the Inspector General—prompted by congressional inquiry—concluded that both the release of the data to the Navy, and the Navy's distribution to contractors, were improper.

In its June 17, 1997, audit report, the Inspector General recommended that procedures be implemented to better safeguard Colt's proprietary data.

In a July 29, 1997, letter to the Army, Colt's estimated the damages arising from the improper release of Colt's technical data at between 43.5 and 70 million dollars. At Colt's request, a series of meetings were held during the late summer and early fall of 1997 to discuss the M16 licensing issue and also—at Colt's insistence—ownership of the technical data rights relating to the M4 carbine. Although Colt's had previously characterized the M4 as subject to the 1967 Licensing Agreement, the company now sought the Army's confirmation that the M4 Carbine was not covered by the licensing agreement. In support of that contention, Colt's offered evidence that * * of the M4's parts had been developed, tested and refined solely at Colt's expense.

Colt's and the Army conducted settlement discussions in September 1997. Despite the Army's earlier representation to Colt's that the disclosure did not constitute a breach of the licensing agreement, the Army nonetheless possessed, in the words of an Army attorney involved in the settlement negotiations, a "great concern" that a resort to litigation in the absence of a settlement might jeopardize the Army's right to use Colt's proprietary technical data in the manufacture of the M16.

A final agreement, referred to as the "M4 Addendum," was reached on December 24, 1997. Described by the participants as a "global settlement," the addendum and an earlier-executed Memorandum of Understanding were designed to address the entire range of issues then existing between Colt's and the Government; including clarification of a military use restriction in the 1967 Licensing Agreement, that, according to Colt's, barred the Government from selling surplus weapons to state and local police authorities. The M4 Addendum itself was comprised of two parts: first, a characterization of the Army's rights in the M4 technical data; sec-

---

1. M4A1 adapter kits permit modification of the M4A1 to allow the weapon to fire special rounds during training exercises.

ond, a clarification of the status of the M16 licensing agreement.

With regard to the M16 rights, the Addendum reaffirmed the status quo set forth in the 1967 Licensing Agreement, thus constituting, by its terms, the complete satisfaction of all claims arising from the improper disclosure (meaning that the terms of the 1967 license essentially would remain in place with Colt's neither pursuing its multi-million dollar damage claim nor maintaining its position that the license was terminated in light of the alleged breach). As to the M4 data rights, the Addendum granted the Government a non-exclusive, non-transferable limited rights license in M4 data that precluded the Government from using the M4's technical data package in competitive procurements until the year 2011. Edward L. Stolarun, a patent attorney employed by the U.S. Army Material Command Headquarters and a participant in the negotiations, later characterized the Addendum's resolution of the M4 data issue as an acknowledgment by the Government, reached after careful review of Colt's documentation, that Colt's indeed possessed proprietary rights in the M4 technical data.

On May 5, 1998, the Army awarded a sole-source contract for M4 carbines to Colt's, citing as its justification for the sole-source award the Army's lack of technical data rights in certain components of the M4. In response, FNMI filed a protest in this court, challenging the justification on the ground that the Army had improperly relinquished data rights in the M4 that it already possessed, and in doing so had impermissibly created the very circumstance—the absence of data rights—on which it then relied to support its sole-source decision. While the question of whether the Government *relinquished* data rights already in its possession or merely *acknowledged* data rights belonging to Colt's is central to the resolution of this case, we need not reach that issue in order to present the following Ruling on Law.

### Analysis

FNMI's argument against the legitimacy of the Government's actions is twofold. It contends, first, that the Government, in relinquishing technical data rights in the M4, violated the terms of 10 U.S.C. § 2320 (1994) by failing to retain rights sufficient to allow for competitive procurement, and, second, that the M4 addendum to the M16 licensing agreement impermissibly inhibited competition in contravention of the Competition in Contracting Act (CICA), 10 U.S.C. § 2304 (1994). We address these arguments in turn.

### The Addendum as a Violation of 10 U.S.C. § 2320

Plaintiff's first challenge to the sole-source award arises from its assertion that the Government unlawfully relinquished rights in technical data to which it was otherwise entitled. Leaving aside the issue of whether the Government in fact possessed any such rights—an assertion we accept as true only for purposes of this Ruling on Law—we turn to the question of what limits, if any, 10 U.S.C. § 2320 imposes on the Government's authority to relinquish technical data rights.

The subsection of the statute on which plaintiff relies, 10 U.S.C. § 2320(a)(2)(G)(ii), reads as follows:

(G) The Secretary of Defense may—

. . .

(ii) agree to restrict rights in technical data otherwise accorded to the United States under this section if the United States receives a royalty-free license to use, release, or disclose the data for purposes of the United States (including purposes of competitive procurement).

Plaintiff interprets this subsection as prohibiting a restriction on the Government's rights in technical data unless minimum rights of use—specifically, those that would allow the data's use in competitive procurements—are retained. Because the Government's relinquishment of M4 data rights sets the stage for sole-source procurements through the year 2011, the M4 Addendum, plaintiff maintains, violates the explicit mandate of 10 U.S.C. § 2320.

A closer reading of the statute, however, requires a different conclusion. We cannot accept the argument that the Government, in relinquishing a right to use the M4 technical data for proposes of competitive procurement, thereby violated 10 U.S.C

§ 2320(a)(2)(G)(ii) because the limitations imposed by that subsection have no application where—as here—the data at issue was developed either wholly or partially at private expense. That conclusion derives both from the specific language of the referenced subsection—it applies only to those rights "specifically *accorded* to the United States" (italics supplied) under the provisions of 10 U.S.C. § 2320—and from the remainder of the statutory framework, in particular § 2320(a)(2)(E), which authorizes the Government, in situations where a developmental effort involves both federal and private funding, to negotiate the particular rights it will receive. We explain further.

Under 10 U.S.C. § 2320, the United States is "accorded" rights in technical data in one instance only, *i.e.*, where Government money represents the *exclusive* funding source in the development of the item or process in question. In that circumstance alone, the statute gives to the United States a right, described as an "unlimited" right. The pertinent section of the statute, 10 U.S.C. § 2320(a)(2)(A), reads in relevant part as follows:

(A) In the case of an item or process that is developed by a contractor or subcontractor exclusively with Federal funds ... the United States shall have the unlimited right to—

(i) use technical data pertaining to the item or process; or

(ii) release or disclose the technical data to persons outside the government or permit the use of the technical data by such persons.

Conversely, in the situation where an item or process is developed by a contractor or subcontractor exclusively at private expense, the contractor or subcontractor "may restrict the right of the United States to release or disclose technical data pertaining to the item or process to persons outside the Government, or permit the use of the technical data by such persons." 10 U.S.C. § 2320(a)(2)(B).

In contrast to the exclusive funding situations identified above, the statute does not specify any minimum rights that the Government or the contractor must receive where the development of an item has been achieved through the use of *both* Government funds and private funds. Rather, in such instances, the statute specifies that "the respective rights of the United States and of the contractor ... in technical data pertaining to such item or process shall be established as early in the acquisition process as practicable ... and shall be based upon negotiations between the United States and the contractor taking into account:

(i) The statement of congressional policy and objectives in section 200 of title 35 [relating to patent rights in inventions made with federal assistance], the statement of purposes in section 2(b) of the Small Business Innovation Development Act of 1982 (15 U.S.C. 638 note), and the declaration of policy in section 2 of the Small Business Act (15 U.S.C. 631).

(ii) The interest of the United States in increasing competition and lowering costs by developing and locating alternative sources of supply and manufacture.

(iii) The interest of the United States in encouraging contractors to develop at private expense items for use by the Government.

(iv) Such other factors as the Secretary of Defense may prescribe.

10 U.S.C. § 2320(a)(2)(E).

◼ Two conclusions are evident from the statutory framework set forth in 10 U.S.C. § 2320. First, rights which result from negotiations between contractor and Government cannot be said—in contrast to the unlimited rights specifically conferred by section 2320(a)(1)(A) in the case of exclusive Government funding—to have been *accorded* under the statute. Rather, they are rights sanctioned by the statute. Hence, in mixed funding situations, the limitations of section 2320(a)(2)(G)(ii) do not, by their terms, apply.

◼ Second, the negotiation process prescribed for the mixed funding situation imposes no minimum requirement as to the level of rights in technical data that the Government must obtain. Rather, what is called for is an evaluative process in which the Government's interests in securing broad rights in technical data are weighed against

the economic incentive to the private sector that the acceptance of more limited Government rights might help secure. Were we to interpret the limitations set forth in § 2320(a)(1)(G)(ii) as applying to a mixed funding situation, the Government would be required to *retain* a higher level of rights in technical data in subsequent negotiations (meaning, the settlement negotiations) than it would have been required to *obtain* during initial negotiations. Since 10 U.S.C. § 2320 imposes no minimum requirement on rights the Government must negotiate in the mixed funding context, we see no reason to preclude it from relinquishing rights it had no obligation to obtain in the first instance. Contrary to plaintiff's argument, we see nothing within the statutory language of 10 U.S.C. § 2320 to change that result.

▮ To the extent, then, that it is correct to view this case as one in which the development of the M4 was achieved through both public and private sources, the Government clearly had the right to relinquish any rights it may otherwise have negotiated.

### The Addendum as a Violation of the Competition in Contracting Act (CICA)

Our holding that the Government has the right to relinquish its interest in technical data does not, however, immunize the Addendum from challenge on the grounds that it violated the Competition in Contracting Act's mandate for full and open competition in Government procurements. 10 U.S.C. § 2304. Plaintiff argues that the practical effect of the M4 Addendum—the limiting of competition until 2011—runs afoul of CICA, and must, as a consequence, be struck down as contrary to law. While we agree that certain relinquishments of technical data rights could in fact represent impermissible violations of CICA, we refuse to go so far as to conclude that *any* relinquishment of data rights which serves to limit or eliminate competition must necessarily be found unlawful.

▮ If the Government relinquishes data rights as a bargaining tool to satisfy or extinguish an unrelated claim, it comes into conflict with the Competition in Contracting Act and its actions must be voided. *Executive Business Media v. United States Depart-ment of Defense*, 3 F.3d 759 (4th Cir.1993) and *Earth Property Servs., Inc.*, B–237742, March 13, 1990, 90–1 CPD ¶ 273, the primary cases on which plaintiff relies, illustrate that principle. The Government may not simply "give away" data rights which are not at stake if, in doing so, it subverts the goals of CICA.

▮ If instead, however, the Government relinquishes data rights that are themselves in dispute, its actions cannot be said impermissibly to contravene CICA. This is so because the range of settlement possibilities available to the Government as a litigant seeking to establish its data rights cannot be narrower than the range of possible outcomes litigation of the matter could produce. Put differently, we do not read CICA as preventing the Government from achieving, through settlement, a result with regard to data rights that a court, faced with the identical dispute, could itself reach as an adjudicated outcome.

Applying that rationale to the case before us, we conclude that the Government's relinquishment of its rights in the M4 technical data would run afoul of CICA if the Government's rights could not, under any reasonable assessment of the litigation risks, have been construed as being in jeopardy. More specifically, if neither the alleged breach of the M16 Licensing Agreement nor Colt's independent claim that the M4 had been developed at private expense reasonably held out the possibility that the Government's rights in the M4 would be compromised or lost through litigation of those issues, then the terms of the settlement must be deemed illegal. The Government's relinquishment of rights that were not legitimately in dispute would amount to an impermissible give-away—an action prompted not by a bonafide assessment of the risks facing it in litigation nor by the factors enumerated in § 2320(a)(2)(E), but rather by an interest in ridding itself of the burden of a lawsuit at the price of granting the contractor exclusive control over important technical data, thereby subverting the aims of the Competition in Contracting Act. That, as discussed above, is something the Government may not do.

### Conclusion

To the extent that the M4 was not developed solely at public expense, the Government was free, under 10 U.S.C. § 2320, to relinquish rights in technical data without retaining the authority competitively to procure the items dependent on that data. The relinquishment may nonetheless represent an impermissible violation of CICA, however, if the settlement reached with respect to the technical data rights at issue adopted a position not realistically within the outcome risks posed either by the threatened breach of contract action or by Colt's separate claim of ownership of the M4. We leave open for further inquiry the factual issues this Ruling poses: specifically, whether the M4 rights belonged to the Government in the first instance, and if so, whether the loss of those rights could reasonably be interpreted as within the litigation risks the Government faced.