# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Cubic Defense Applications, Inc. | ) ASBCA No. 58519 |
| | ) |
| Under Contract No. N00039-03-C-0024 | ) |

APPEARANCES FOR THE APPELLANT:   Paul F. Khoury, Esq.
                                 Tracye Winfrey Howard, Esq.
                                  Wiley Rein LLP
                                  Washington, DC

APPEARANCES FOR THE GOVERNMENT:  Craig D. Jensen, Esq.
                                  Navy Chief Trial Attorney
                                 David Koman, Esq.
                                 Ellen M. Evans, Esq.
                                  Senior Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE HARTMAN
## ON APPELLANT'S MOTION FOR SUMMARY JUDGMENT

Appellant moves for summary judgment on the ground that the government "expressly and unambiguously released the claim that is the subject of this Appeal" when it entered into a "global settlement" with appellant amicably resolving ASBCA Nos. 56097 and 56288, both of which concerned Contract No. N00039-03-C-0024. The government opposes appellant's summary judgment motion on the grounds: its challenge to appellant's data rights assertions here is not barred by the language of the parties' earlier settlement agreement; the right to challenge data rights assertions by a contractor is a statutory "right" provided to the Secretary of Defense that cannot be waived by a contracting officer (CO); and there are genuine issues of material fact precluding grant of appellant's motion.

## STATEMENT OF FACTS FOR PURPOSES OF THE MOTION

During 2003, the Department of the Navy, Space and Naval Warfare Systems Command (SPAWAR) awarded Contract No. N00039-03-C-0024 (contract), in the amount of $31,818,433.00 for the design, development, testing, production, integration, deployment, documentation, engineering technical services and logistical support of a system meeting the requirements of the AN/USQ-167 Communications Data Link System (CDLS) to Cubic Defense Applications, Inc. (Cubic). CDLS "is a wideband data link for the transmission of signal and imagery intelligence data" between a ship and an airborne military aircraft such as the Global Hawk, U-2, F-18, or P-3. The contract incorporated by reference various clauses from the Department of Defense Federal Acquisition Regulation

Supplement (DFARS), including: DFARS 252.227-7013, RIGHTS IN TECHNICAL DATA—NONCOMMERCIAL ITEMS (NOV 1995); DFARS 252.227-7014, RIGHTS IN NONCOMMERCIAL COMPUTER SOFTWARE AND NONCOMMERCIAL COMPUTER SOFTWARE DOCUMENTS (JUN 1995); DFARS 252.227-7015, TECHNICAL DATA—COMMERCIAL ITEMS (NOV 1995); DFARS 252.227-7019, VALIDATION OF ASSERTED RESTRICTIONS—COMPUTER SOFTWARE (JUN 1995); and DFARS 252.227-7037, VALIDATION OF RESTRICTIVE MARKINGS ON TECHNICAL DATA (SEP 1999). (R4, tab 2 at 78, 112, 241, 242)

As part of its 30 September 2002 "proposal" to perform the contract, Cubic submitted to SPAWAR the following table pursuant to DFARS 252.227-7017, IDENTIFICATION AND ASSERTION OF USE, RELEASE, OR DISCLOSURE RESTRICTIONS (JUN 1995):

| Technical Data or Computer Software to be Furnished With Restrictions* | Basis for Assertion** | Asserted Rights Category*** | Name of Person Asserting Restrictions**** |
|---|---|---|---|
| CDRL Item A004, Technical Report – Studies/Services | Mixed Funding | Limited | Cubic Defense Systems, Inc. |
| CDRL Item A006, Technical Report – Studies/Services | Mixed Funding | Limited | Cubic Defense Systems, Inc. |
| CDRL Item A007, Technical Report – Studies/Services | Mixed Funding | Limited | Cubic Defense Systems, Inc. |
| CDRL Item A00Z, Logistics Management Information | Mixed Funding | Limited | Cubic Defense Systems, Inc. |
| CDRL Item A017, Baseline Description Document | Mixed Funding | Limited | Cubic Defense Systems, Inc. |
| CDRL Item A01G, Product Drawings and Associated Lists | Mixed Funding | Limited | Cubic Defense Systems, Inc. |
| CDRL Item A01L, Software Maintenance Plan | Mixed Funding | Limited | Cubic Defense Systems, Inc. |
| CDRL Item A01M, Software Requirements Specification | Mixed Funding | Limited | Cubic Defense Systems, Inc. |
| CDRL Item A01N, System/Subsystem Design Description | Mixed Funding | Limited | Cubic Defense Systems, Inc. |
| CDRL Item A01P, Software Design Description | Mixed Funding | Limited | Cubic Defense Systems, Inc. |

| | | | |
|---|---|---|---|
| CDRL Item A01Q, Software Interface Design Description | Mixed Funding | Limited | Cubic Defense Systems, Inc. |
| CDRL Item A01R, Software Version Description | Mixed Funding | Limited | Cubic Defense Systems, Inc. |
| CDRL Item A01S, Interface Control Document | Mixed Funding | Limited | Cubic Defense Systems, Inc. |
| CDRL Item A01T, Interface Design Description | Mixed Funding | Limited | Cubic Defense Systems, Inc. |
| CDRL Item A01U | Mixed Funding | Limited | Cubic Defense Systems, Inc. |
| CDRL Item A009, Test Plan Computer Software Product End Items | Mixed Funding | Limited | Cubic Defense Systems, Inc. |

\* For technical data (other than computer software documentation) pertaining to items, components, or processes developed at private expense, identify both the deliverable technical data and each such item, component, or process. For computer software or computer software documentation identify the software or documentation.

\*\* Generally, development at private expense, either exclusively or partially, is the only basis for asserting restrictions. For technical data, other than computer software documentation, development refers to development of the item, component, or process to which the data pertain. The Government's rights in computer software documentation generally may not be restricted. For computer software, development refers to the software. Indicate whether development was accomplished exclusively or partially at private expense. If development was not accomplished at private expense, or for computer software documentation, enter the specific basis for asserting restrictions.

\*\*\* Enter asserted rights category (e.g., government purpose license rights from a prior contract, rights in SBIR data generated under another contract, limited, restricted, or government purpose rights under this or a prior contract, or specially negotiated licenses).

\*\*\*\* Corporation, individual, or other person, as appropriate.

(R4, tab 1 at 74-76)

In July 2007, after submitting to the CO a Request for Equitable Adjustment and Certified Claim in the amount of $6,511,103 contending that Cubic incurred increased costs and schedule delays as a result of constructive changes arising from specification defects, and SPAWAR's failure to approve test plans and procedures and expansion of testing requirements, Cubic appealed the "deemed" denial of its claim to this Board, which was docketed as ASBCA No. 56097. During December of 2007, SPAWAR's CO issued a final decision asserting a $4,115,001 claim against Cubic for contract relief SPAWAR provided to Cubic resulting in decreased costs. Cubic again filed an appeal with this Board, and its second appeal was docketed as ASBCA No. 56288. (R4, tabs 6, 11 at 630-31)

On 24 November 2008, Cubic and SPAWAR officials executed a Stipulation of Settlement and Agreement (Settlement Agreement) amicably resolving ASBCA Nos. 56097 and 56288, which provided in part:

> WHEREAS, the parties have negotiated and given full consideration to all matters relating to a compromise and settlement of all matters contained in ASBCA Nos. 56097 and 56288, as well as all matters and/or claims and potential matters and/or claims (known or unknown) arising out of, incidental to, or relating to the Contract;
>
> WHEREAS, **in the interest of resolving all matters relating to ASBCA Nos. 56097 and 56288, as well as all matters and/or claims and potential matters and/or claims (known or unknown) arising under or in regard to the Contract, and under the sound policy of law favoring the settlement of disputes, the parties understand and agree that the parties' agreements herein constitute and represent full consideration for and satisfaction of any and all matters and/or claims brought under ASBCA Nos. 56097 and 56288, as well as all matters and/or claims or potential matters and/or claims (known or unknown) arising under or in regard to the Contract.**
>
> NOW, THEREFORE, in consideration of the mutual promises and agreements of the parties hereto, each to the other, and other valuable consideration, the parties, intending to be legally bound, hereby agree as follows:
>
> 1. Cubic consents to the dismissal with prejudice of ASBCA No. 56097....

4

2. The Government consents to the dismissal with prejudice of ASBCA No. 56288....

3. ...[T]he Government will pay Cubic a single, lump-sum amount of $3,900,000 for complete and final resolution of ASBCA Nos. 56097 and 56288....

4. The parties agree to renegotiate and execute a bi-lateral modification to Contract Line Item Number (hereinafter "CLIN") 0012, pursuant to which Cubic shall: (a) upgrade seven (7) Installation Test Fixtures (hereinafter "ITFs"), to be provided by the Government to Cubic as Government-Furnished Property...for a not-to-exceed price of $913,749....

5. Cubic will resolve, at no cost to the Government, all issues identified by the Government in SPAWAR Letter 08-154 dated 7 August 2008, including hardware, software, and firmware retrofits to all CDL systems delivered under the Contract.... Provided that Cubic meets its commitment under this Paragraph 5, the Government will not withhold final payment under the Contract because of this issue beyond 30 March 2010.

6. Upon Cubic's completion of the work identified in Paragraph 5 above, the Government will remove any conditional acceptance concerning the first two CDL Systems delivered by Cubic under the Contract....

**7. The Government acknowledges that all data items on the Contract Data Requirements List (hereinafter "CDRL") previously submitted by Cubic are approved and that Cubic has no obligation to submit any further data items with the exception of:** (a) Test Reports under CDRL A00J for any remaining hardware deliverables; and (b) a Test Report documenting the hardware, software, and firmware retrofits described in Paragraph 5, above.

....

10. Cubic shall deliver the two INCO kits referenced above in Paragraph 4 to the Government by no later than seven (7) months from execution of the bi-lateral Contract Modification for CLIN 0012....

5

11. In anticipation of Contract close-out, the Government acknowledges that Cubic has fully satisfied all requirements set forth in Contract Clause B-1 ("Payment of Fixed Fee Based on Staff Hours") and Contract Clause B-2 ("Fee Adjustment Formula")....

12. **The Government, to the extent permitted by law, releases and saves harmless Cubic**, its parent company, subsidiaries, affiliates, agents, servants, employees, officials, subcontractors, suppliers, successors, and assigns, shareholders, and sureties **from ASBCA No. 56288 and any further claim, liability, obligation, appeal, action or demand, known or unknown, or any other avenue of relief in connection with, arising out of, incidental to, or relating to the Contract as of the date this Agreement is executed. Notwithstanding anything to the contrary, this release does not extend to any claims related to the Contract that may arise in the future**.

13. Cubic warrants and represents that no other action by Cubic with respect to the Contract is pending or will be filed in any court, administrative body, or legislative body based on any action or inaction by the Government as of the date this Agreement is executed....

14. **Upon execution of this Agreement, Cubic releases and saves harmless the Government**, including its officials, officers, enlisted personnel, employees, and agents from these appeals and from any further claim, liability, obligation, appeal, action or demand of Cubic, its subsidiaries, affiliates, agents, servants, employees, officials, subcontractors, suppliers, successors, and assigns, shareholders, and sureties **from ASBCA No. 56097 and any further claim, liability obligation, appeal, action or demand, known or unknown, or any other avenue of relief in connection with, arising out of, incidental to, or relating to the Contract (including, but not limited to claims or appeals for or in regard to alleged delay, disruption, impact, direct costs and/or cumulative disruption or impact) as of the date this Agreement is executed. Notwithstanding anything to the contrary, this release does not extend to any claims related to the Contract that may arise in the future**.

6

15. This Agreement is for the sole purpose of settling all claims and appeals arising out of, incidental to, or relating to the Contract, and this Agreement shall not be cited or otherwise referred to by either Cubic or the Government in any proceedings, whether judicial or administrative in nature, except as is necessary to effect the terms of this Agreement.

16. This Agreement contains the entire agreement and understanding between the parties concerning the subject matter herein (including, but not limited to, ASBCA Nos. 56097 and 56288) and supersedes and replaces all prior claims, settlement negotiations, and agreements written or oral concerning the subject matter.

(R4, tab 11) (Emphasis added)

In July of 2009, the parties executed Modification No. P00035 to their contract altering CLIN 0012 and providing for "settlement of the Contractor's certified claim against the Government submitted 8 May 2007" and subsequent appeal before the ASBCA docketed as ASBCA No. 56097, and "the Government's claim against the Contractor" docketed as ASBCA No. 56288 (R4, tab 12 at 641). Modification No. P00035 stated that Cubic will promptly file its submission to dismiss ASBCA No. 56097 with prejudice upon execution of the modification and that the government will promptly file its submission to dismiss ASBCA No. 56288 upon execution of the modification (*id.* at 642). The modification contained release language similar to that set forth in the parties' Settlement Agreement. Paragraph 12 of the modification provided:

> The Government, **to the extent permitted by law**, releases and saves harmless Cubic...from ASBCA No. 56288 and any further claim, liability, obligation, appeal, action or demand, known or unknown, or any other avenue of relief in connection with, arising out of, incidental to, or relating to the Contract. **Notwithstanding anything to the contrary, this release does not extend to any claims related to the Contract that may arise in the future**. [Emphasis added]

(*Id.* at 644) Paragraph 14 of the modification provided:

> **Upon execution of this modification, Cubic releases and saves harmless the Government**...from ASBCA No. 56097 and any further claim, liability obligation, appeal, action or demand, known or unknown, or any other

7

avenue of relief in connection with, arising out of, incidental to, or relating to the Contract (including, but not limited to claims or appeals for or in regard to alleged delay, disruption, impact, direct costs and/or cumulative disruption or impact). **Notwithstanding anything to the contrary, this release does not extend to any claims related to the Contract that may arise in the future.** [Emphasis added]

(*Id.*) The ASBCA received motions to dismiss the appeals with prejudice from the parties in September 2009 and the appeals were dismissed.

During November of 2011, Cubic submitted to SPAWAR a proposal for three additional CDL Systems, 15 modified KI-11A subsystems, an Engineering Change Proposal, 11 engineering change kits for Aircraft Carrier-Tactical Support Center Integration, and engineering services (*see* R4, tabs 14-15, 22). In a table submitted pursuant to DFARS 252.227-7017, Cubic asserted that the government's right to use, release, or disclose specific technical data or computer software was restricted to "Limited" rights on the basis that development of the data and/or software had been "Internal R&D Funding" (R4, tab 14). Cubic stated that it was "asserting its rights established in the baseline (initial) CDLS Contract (Contract #N00039-03-C-0024) for legacy CDLS items" (*id.* at 654). About three weeks later, a SPAWAR contract specialist advised the SPAWAR CO and Cubic by email that he did not agree with Cubic's assertion of data rights. He stated:

CDRL deliverables under the last contract have been developed with funding provided by the Government and not with "internal R&D funding." Data rights should be "unlimited" since these items have been developed with Government funding. If this is refuted, then the Government requires supporting documentation that can substantiate that internal funding was used.

(R4, tab 15 at 660, 662) During the next six months, the parties engaged in various communications regarding Cubic's assertion of data rights (*e.g.*, R4, tabs 16-19) and, on 17 July 2012, met to discuss Cubic's limited rights assertion based on funding sources (R4, tab 20 at 697). By letter and email dated 20 July 2012, Cubic provided SPAWAR information it believed justified its limited rights assertion for Part No. 285875 (programmable loads module) (*id.* at 697-712, tab 21).

On 2 August 2012, SPAWAR awarded Contract No. N00039-12-C-0084 to Cubic for three CDL Systems, 15 modified KI-11A subsystems, an Engineering Change Proposal, 11 engineering change kits for Aircraft Carrier-Tactical Support Center Integration, and engineering services (KI-11A Subsystem Contract) (R4,

tab 22). On the same date, a SPAWAR CO sent a letter to Cubic regarding the initial Contract No. N00039-03-C-0024, stating:

> The Government is challenging the validity of the Cubic Restricted Rights assertions, because Cubic cites mixed funding behind the development of...CDRL's, yet claims Limited Rights in the CDRL's.
>
> As required by []252.227-7037, *Validation of Restrictive Markings On Technical Data*, of the DFARS, which is incorporated by reference into [the Contract], the [CO] requires that Cubic provide the written records it is relying on as justification behind its...assertions. These records must be in sufficient detail to enable the [CO] to determine the validity of the Limited Rights assertions.
>
> Please also be advised that if Cubic fails to respond to this letter...with the required documentation, the [CO] shall issue a final decision, in accordance with paragraph (f) of this clause and the Disputes clause of [the Contract] pertaining to the validity of the asserted restrictions.

(R4, tab 23 at 838)

By letter dated 6 September 2012, Cubic submitted a response to the CO's letter stating it was providing "information supporting Cubic's claim of limited and restricted rights" in Contract No. N00039-12-C-0084, the second CDLS contract (R4, tab 24 at 916). In a letter dated 25 September 2012, the CO advised Cubic that its letter was "non-responsive" because the government's letter addressed "Cubic's data rights assertions in the 2003 CDLS contract" and Cubic must "justify the data rights assertions made" with respect to the initial contract "before the allocation of data rights (if any) in the follow-on...contract" (R4, tab 25 at 956). The CO added that, "[b]ecause Cubic did not appear to understand what the Government wanted," the government "will add an additional 14 days time to the 60 day period that is currently in effect, to allow Cubic to provide an adequate response" by close of business on 16 October 2012 (*id.* at 957).

By letter dated 16 October 2012, Cubic advised SPAWAR:

> In its September 6, 2012 letter, Cubic indicated that it would deliver [3 items] subject to restriction and that it would deliver all other technical data and computer software required under the KI-11A Subsystem Contract subject to Government Purpose Rights....

9

> After further review of the KI-11A Subsystem SOW and CDRLs, however, Cubic has determined that the technical data that are required to be delivered under those CDRLs relate specifically to the KI-11A Subsystem being developed under the KI-11A Subsystem Contract. Consequently, with the one exception noted below, the Government is entitled to unlimited rights in that technical data.
>
> ....
>
> The sole exception to the above is the KI-16 COMSEC Module. As explained and demonstrated...at Cubic's facility on July 17, 2012, Cubic partially developed the KI-16 using internal IRAD funding. Cubic therefore is willing to provide SPAWAR with Government Purpose Rights in the technical data associated with that item.

(R4, tab 26 at 962-63) Cubic added in a footnote to its letter that it understood the CO's "challenge to Cubic's data rights assertions" to "relate to the assertions made by Cubic in connection with its proposal for the KI-11A Subsystem Contract" and not to "any of the restrictive markings on technical data delivered under Cubic's Contract No. N00039-03-C-0024" (*id.* at 962).

In a letter dated 13 November 2012, SPAWAR's CO notified Cubic that its 16 October letter was "non-responsive to the Government data rights challenge" and, after reviewing the correspondence between the parties, "the Government does not see how Cubic can possibly take an understanding...that the Government has been talking about vetting the data rights assertions to the 2012 (N00039-12-C-0084) CDLS contract" when it "has been attempting to vet the data rights assertions from...the 2003 (N00039-03-C-0024) contract" (R4, tab 27 at 966). The CO added she "can only conclude th[at] Cubic's non-understanding is intentional, and...Cubic either cannot or will not provide the required documentation behind the assertions" with respect to the 2003 contract (*id.* at 966-67). The CO advised that, "[i]n view of the above, the Government will incorporate the [2012 data] assertions into the N00039-12-C-0084 [follow-on] contract" but requires "Cubic provide the written records it is relying on as justification" for its rights assertions regarding the initial contract (*id.* at 967). The CO added, if Cubic failed to provide the required records by close of business on 20 November 2012, she would issue a final decision addressing the validity of the initial contract asserted restrictions (*id.*).

On 20 November 2012, Cubic notified the CO that "SPAWAR's challenge to Cubic's restrictive markings on any technical data delivered prior to November 24, 2008, is barred and moot" because SPAWAR provided Cubic with a general release in

settling ASBCA Nos. 56097 and 56288, and Cubic "has no obligation to produce – and will not be producing – any written records to justify" restrictive markings (R4, tab 28 at 974-75). About two months later, SPAWAR's CO issued a "final decision" notifying Cubic that, because it had "not provided the documentation behind the data rights assertions" with respect to the initial contract "as required by regulation," it "is not entitled to make the...assertions and the Government is entitled to Unlimited Rights in the technical data and computer software" listed (R4, tab 29 at 989-90). Less than two weeks later, Cubic timely filed an appeal of the CO's decision with this Board.

## STATUTORY AND REGULATORY FRAMEWORK

The first provision specifying treatment by the government of contractor rights in technical data appeared in the 1955 version of the Armed Services Procurement Regulation (ASPR). Prior to that time, military regulations addressed only contractor data subject to a patent or copyright. *Bell Helicopter Textron*, ASBCA No. 21192, 85-3 BCA ¶ 18,415 at 92,388; Donna C. Maizel, *Trade Secrets and Technical Data Rights in Gov't Contracts*, 114 Mil. L. Rev. 225, 235 (1986); Robert M. Hinrichs, *Proprietary Data and Trade Secrets under Department of Defense Contracts*, 36 Mil. L. Rev. 61, 71 (1967); Arthur R. Whale, *Government Rights to Technical Information Received Under Contract*, 25 Geo. Wash. L. Rev. 289, 295 (1957).

ASPR 9-112 (4 Jan. 1955), a mandatory clause for all Department of Defense (DoD) research and development (R&D) contracts, gave the United States "the right to reproduce, use, and disclose for Governmental purposes" all of the "reports, drawings, blueprints, data, and technical information specified to be delivered by the Contractor to the Government under th[e] contract" with no regard to whether the data originated before or after the contract award. The DoD construed this grant of right as including the right to use such data for competitive procurement. B-152684, 44 Comp. Gen. 451 (5 Feb. 1965); Ralph C. Nash, Jr. & Leonard Rawicz, *Intellectual Property in Government Contracts*, 457 (6th ed. 2008); Greg S. Sharp, *A Layman's Guide to Intellectual Property In Defense Contracts*, 33 Pub. Cont. L.J. 99, 103 (2003); Maizel, *Trade Secrets,* 114 Mil. L. Rev. at 235; Hinrichs, *Proprietary Data,* 36 Mil. L. Rev. at 71; Ray M. Harris, *Trade Secrets as they Affect the Government*, 18 Bus. Law 613, 619 (1963); Whale, *Government Rights,* 25 Geo. Wash. L. Rev. at 296.

After the defense industry objected to the loss of rights in data, DoD rewrote the ASPR to give contractors protection for data they delivered under supply contracts, while maintaining unlimited rights in data delivered under R&D contracts. Pursuant to the 1957 regulations, information was classified as "proprietary data, design data, or operational data." Design and operational data continued to be subject to delivery to and use by DoD under supply contracts, but "proprietary" data was protected. It was not to be requested in advertised supply contracts for standard commercial items and was to be obtained in negotiated supply contracts only if a clear need was established and the data was specified in the contract's schedule. A clause for data delivered under such contracts provided DoD

11

was to obtain rights in proprietary data sufficient to permit the data's required use, which was "limited rights" if only needed for a limited purpose. This clause was to be used with another providing: data so limited was to be identified in the schedule as being subject to limitation; a legend was to be placed on such data identifying the portion or pages to which the legend applied; and DoD possessed the right "at any time to modify, remove, obliterate or ignore any marking not authorized by the terms of the contract," subject to contractor right of appeal under the disputes clause. The 1957 ASPR additionally set forth a new policy of obtaining and utilizing a contractor's "engineering drawings" to allow procurement by formal advertisement. DoD's specification for drawing preparation (Military Specification MIL-D-70327, "Drawings, Engineering and Associated Lists"), however, required drawings to be so complete that they often revealed trade secrets utilized in the manufacture of an item. Industry and Members of Congress contended the 1957 revision was "offensive to the American way of business" because the originator of a design enjoyed no competitive advantage in bidding to perform subsequent solicitations no matter how much money or private resources it had expended in developing that item, and the revised ASPR lasted only a year. ASPR 9-201, 9-202.2, 9-203.1, 9-203.2 (9 Apr. 1957) *reprinted* at 22 Fed. Reg. 6335, 6336 (8 Aug. 1957); B-138638, 38 Comp. Gen. 667 (6 Apr. 1959); Nash & Rawicz, *Intellectual Property* at 458-60; Maizel, *Trade Secrets,* 114 Mil. L. Rev. at 235; Hinrichs, *Proprietary Data,* 36 Mil. L. Rev. at 71-72; William Munves, *Proprietary Data in Defense Procurement,* 1962 Mil. L. Rev. 155, 169-72, 174; *see Hearings on Proprietary Rights & Data before Subcommittee No. 2 of the House Select Committee on Small Business,* 86th Cong. 2d Sess. 2, 18-20, 32-33 (1960).

During 1958, to provide greater protection of contractor proprietary data, DoD altered the ASPR to provide that, in any "supply" contract not having experimental or research work as one of its principal purposes, proprietary data need not be furnished absent identification in the contract's delivery schedule. ASPR 9.202-1(b) (15 Oct. 1958), *reprinted* in 23 Fed. Reg. 10432 (30 Dec. 1958); ASPR 9.203-2, *reprinted* in 23 Fed. Reg. 10434 (30 Dec. 1958). This allowed a DoD contractor to remove its proprietary data from drawings, unless otherwise specifically required by the delivery schedule. In sum, DoD received a second set of drawings from the contractor with trade secrets expunged. Nash & Rawicz, *Intellectual Property* at 460; Maizel, *Trade Secrets,* 114 Mil. L. Rev. at 240; Hinrichs, *Proprietary Data,* 36 Mil. L. Rev. at 72.

Neither DoD nor contractors, however, were happy with the 1958 ASPR revision. DoD contended under the regulation it received data that was so incomplete as to be not useable. The expunged drawings sometimes were referred to as "swiss cheese drawings." Defense contractors were highly critical of DoD's interpretation of ASPR's definition of proprietary data as excluding any component or end product that could be ascertained by the practice of "reverse engineering." They asserted the 1958 ASPR harmed their competitive positions by requiring them to disclose information and, if DoD really needed that data, it should pay for it. *Hearings on Proprietary Rights & Data before Subcommittee No. 2,* 86th Cong. 2d Sess. 27, 30, 34, 38-44, 52, 69, 109, 121-42, 175; Sharp, *A Layman's Guide,* 33 Pub. Cont. L.J. at 103 (the ASPR at times forced DoD to

repurchase from original source); Maizel, *Trade Secrets*, 114 Mil. L. Rev. at 240; Hinrichs, *Proprietary Data*, 36 Mil. L. Rev. at 72-73; Munves, *Proprietary Data*, 1962 Mil. L. Rev. at 156, 166-67, 178-79.

In 1964, as a result of increasing contractor dissatisfaction, DoD abandoned the concept of contractor "proprietary data" and broadened a contractor's right to protect data. DoD altered the ASPR to define a contractor's rights in terms of "technical data" (ASPR 9.201(a) (14 May 1964), *reprinted at* 30 Fed. Reg. 6969 (25 May 1965)), with data that was developed at private expense by a contractor being furnished to DoD on a "limited rights basis" (ASPR 9.202-1(b), *reprinted at* 30 Fed. Reg. 6969 (25 May 1965)) and other data being furnished DoD on an "unlimited rights basis" (ASPR 9.201(c), *reprinted at* 30 Fed. Reg. 6969 (25 May 1965)). The government could no longer claim a right to use all data under R&D contracts. The contractor's right to assert "limited rights" in data was not determined by the type of contract at issue but by whether the item at issue was "developed at private expense." The delivery of "swiss cheese" drawings by a contractor was foreclosed because the contractor could assert limited rights protection in data it developed. The contractor had to deliver a complete technical data package to the government containing a notice that only "limited rights" in data were being conveyed (known as a limited rights or restrictive legend) if data set forth was developed at contractor expense. If a technical data package was not so marked, the government received unlimited rights in that data. If the data furnished was marked with a legend that was not permitted by terms of the contract, the government could assert only "limited rights" in that data pending inquiry by it to the contractor. If the contractor failed to respond to the inquiry or show the legend set forth was authorized, government personnel could "obliterate such legend." Contractors deemed this an improvement over prior practice allowing the government to modify, remove, obliterate or ignore a marking on technical data "without notice" to a contractor. In sum, under the 1964 revised regulations, whether or not technical data was "developed at private expense" was determinative of DoD's right to use the data. The regulatory emphasis was on tracing whose resources had paid for development of the items, components, or processes offered for sale. ASPR 9.202-2(b) (14 May 1964), *reprinted at* 30 Fed. Reg. 6969 (25 May 1965); ASPR 9.202-3(c)(2) (14 May 1964), *reprinted at* 30 Fed. Reg. 6970 (25 May 1965); ASPR 9.203 (14 May 1964), *reprinted at* 30 Fed. Reg. 6970-71 (25 May 1965); Maizel, *Trade Secrets*, 114 Mil. L. Rev. at 245; John B. Framakides, *Technical Data in Government Contracts,* 8 Wm. & Mary L. Rev. 573, 578-79 (1967); Theodore M. Kostos, *Unauthorized Use of Technical Data in Government Contracts: Remedies of the Data Owner,* 6 B.C. L. Rev. 753, 754-55 (1965); Hinrichs, *Proprietary Data*, 36 Mil. L. Rev. at 74-76, 78, 80; *see American Eng'g Co.*, B-156959 (Comp. Gen. 6 Dec. 1965) (government disregarded markings without notice to contractor under 1960 subcontract).

The ASPR, however, did not set forth a definition of the term "developed at private expense." In 1964, 1969, and from 1973 until 1974, the ASPR subcommittee on technical data rights attempted unsuccessfully to define the term. DoD maintained that, where there was a mix of government and private funds, an item could not be said to have

been "developed at private expense." Also, where the government paid for an "improvement" to a privately developed item, it was to receive unlimited rights in the "improvement" and limited rights in the basic item if that item could be "segregated." The definition of the term, along with the issue of whether the government should be contesting limited rights assertions to avoid continued sole source procurement, were presented to the General Accounting Office (GAO) in various bid protest actions. GAO essentially adopted the term's definition advocated by DoD. *Megapulse, Inc.*, B-194986, 80-1 CPD ¶ 42 (Comp. Gen. 5 Jan. 1980).[1]

The 1964 modified regulations remained in force largely unchanged for 20 years. *See* Nash and Rawicz, *Intellectual Property in Government Contracts* at 429; *see also Continental Electronics Mfg. Co.*, ASBCA No. 18704, 76-1 BCA ¶ 11,654. In 1984, however, public outrage over inflated and excessive prices being charged the government for sole-source, spare-parts procurements, H.R. Rep. No. 690, 98th Cong., 2d Sess. 10-12; 39 Fed. Cont. Rep. (BNA) No. 25, at 1183 (Jun. 20, 1983), caused Congress to examine the issue of data rights in government contracts. It determined that an inability of agencies to retrieve technical data the government was authorized to use and furnish to bidders on prospective contracts was impeding the existence of competition for government contracts. H.R. Rep. No. 690 at 14-15; Maizel, *Trade Secrets*, 114 Mil. L. Rev. at 270. Due to the many spare part horror stories that appeared in the press and the seeming inability of DoD to draft regulations necessary to address all relevant issues, Congress enacted three statutes intended to increase competition for award of government contracts and set forth data rights policies: the Competition in Contracting Act of 1984 (CICA), Pub. L. No. 98-369 (18 July 1984), 98 Stat. 1175; the Defense Procurement Reform Act of 1984, Pub. L. No. 98-525, Title XII (19 Oct.), 98 Stat. 2492, 2588-2611; and the Small Business and Federal Procurement Competition Enhancement Act of 1984, Pub. L. No. 98-577 (30 Oct. 1984), 98 Stat. 3066. William C. Anderson, *Comparative Analysis of Intellectual Property Issues Relating to the Acquisition of Commercial and Noncommercial Items by the Federal Government*, 33 Pub. Cont. L.J. 47 (Fall 2003); Diane M. Sidebottom, *Intellectual Property in Federal Government Contracts: The Past, The Present, and*

---

[1] During 1985, the definition of the term was before us for resolution and we essentially ruled the same as GAO, i.e., that "private expense" means "totally" at private expense. We held additionally the term "developed" meant practicability, workability, and functionability (which we deemed to be essentially synonymous for this purpose) must be demonstrated, i.e., the item or component must be analyzed and/or tested sufficiently to demonstrate to reasonable persons skilled in the applicable art that there is a high probability the item or component will work as intended. *Bell Helicopter*, 85-3 BCA ¶ 18,415 at 92,389-94, 92,424; Maizel, *Trade Secrets*, 114 Mil. L. Rev. at 245, 251-54, 256; Hinrichs, *Proprietary Data*, 36 Mil. L. Rev. at 76; *see, e.g.*, B-190798, B-191007, 78-1 CPD ¶ 431 (Comp. Gen. 13 Jun. 1978); B-174866, 52 Comp. Gen. 312 (4 Dec. 1972).

*One Possible Future*, 33 Pub. Cont. L.J. 70-71; Maizel, *Trade Secrets*, 114 Mil. L. Rev. at 270.

For civilian agencies, Congress required the development of regulations affording the government "unlimited rights" in all data developed exclusively with federal funds if such data is specified for delivery and needed to ensure competitive acquisition of substantial quantities of supplies or services in the future. Small Business and Federal Procurement Competition Enhancement Act of 1984, Pub. L. No. 98-577, § 301(b)(1), 98 Stat. 3074 (codified at 41 U.S.C. § 418a(b)(1)(A), (B) (1984), later recodified at 41 U.S.C. § 2302 (2011)). With respect to DoD, Congress provided more detailed guidance, specifying that (in prescribing regulations regarding the legitimate interest of the United States and a contractor in technical or other data under the FAR) the following factors, among others, shall be considered: "Whether technical data was developed – (A) exclusively with Federal funds; (B) exclusively at private expense; or (c) in part with Federal funds and in part at private expense"; and "the interest of the United States in increasing competition and lowering costs by developing and locating alternative sources of supply and manufacture." Defense Procurement Reform Act of 1984, Pub. L. No. 98-525, Title XII (19 Oct.), Part B, 98 Stat. 2492, 2595-96 (codified at 10 U.S.C. § 2320(a)).

Congress stated that regulations issued shall require that, whenever practicable, a contract for supplies or services: (1) define the respective rights of the United States and the contractor or subcontractor (at any tier) regarding any technical data to be delivered; (2) specify the technical data, if any, to be delivered and schedule for such delivery; (3) establish or reference procedures for determining acceptability of technical data to be delivered; (4) establish separate contract line items for the technical data, if any, to be delivered; (5) to the maximum extent practicable, identify in advance of delivery technical data which is to be delivered with restrictions on the right of the United States to use such data; (6) require the contractor to revise any technical data delivered to reflect engineering design changes made during contract performance and affecting the form, fit, and function of the contract items specified; (7) require the contractor to furnish written assurance at time of delivery that the technical data is complete and accurate and satisfies contract data requirements; (8) establish remedies to be available to the United States when data required to be delivered is found to be incomplete or inadequate; and (9) authorize the head of the agency to withhold payments under the contract during any period if the contractor does not meet the requirements of the contract pertaining to the delivery of technical data. Defense Procurement Reform Act of 1984, Pub. L. No. 98-525, 98 Stat. 2596; Small Business and Federal Procurement Competition Enhancement Act of 1984, Pub. L. No. 98-577, 98 Stat. 3075. Congress added that:

(a) A contract for supplies or services...which provides for the delivery of technical data shall provide that—

(1)  A contractor or subcontractor at any tier shall be prepared to furnish to the [CO] a written justification for any restriction asserted by the contractor or subcontractor on the right of the United States to use such technical data; and

(2)  The [CO] may review the validity of any restriction asserted by the contractor or subcontractor under the contract on the right of the United States to use technical data furnished...under the contract if the [CO] determines that reasonable grounds exist to question the current validity of the asserted restriction and that the continued adherence to the asserted restriction by the United States would make it impracticable to procure the item competitively at a later time.

Defense Procurement Reform Act of 1984, 98 Stat. 2597; Small Business and Federal Procurement Competition Enhancement Act of 1984, 98 Stat. 3071 (codified at 41 U.S.C. § 253d, recodified at 41 U.S.C. § 4703).  Congress specified that, if after review a CO determines a challenge to an asserted restriction is warranted, the CO shall provide a written notice to the contractor or subcontractor asserting the restriction stating grounds for challenging the restriction and requiring submission of a response within 60 days justifying validity of the asserted restriction.  Defense Procurement Reform Act of 1984, 98 Stat. 2598; Small Business and Federal Procurement Competition Enhancement Act of 1984, 98 Stat. 3071.  After failure to receive a response or review of the response received, the CO is to issue a decision pertaining to the validity of the asserted restriction.  Defense Procurement Reform Act of 1984, 98 Stat. 2597 (codified at 10 U.S.C. § 2321(e) later redesignated 10 U.S.C. § 2321(g)); Small Business and Federal Procurement Competition Enhancement Act of 1984, 98 Stat. 3072.  Congress specified, if a response is submitted to a CO by either a contractor or subcontractor, it shall be considered a "claim" within the meaning of the Contract Disputes Act (CDA).  Defense Procurement Reform Act of 1984, 98 Stat. 2598 (codified at 10 U.S.C. § 2321(f) later redesignated § 2321(h)); Small Business and Federal Procurement Competition Enhancement Act of 1984, 98 Stat. 3072. Finally, Congress directed that, upon final disposition, if the CO's challenge to the restriction on the right of the United States to use the data is sustained, the restriction on the right shall be cancelled and, if the assertion is found not to have been substantially justified, the contractor or subcontractor, as appropriate, shall be liable to the United States for payment of the cost to the United States of reviewing the asserted restriction.  Defense Procurement Reform Act of 1984, 98 Stat. 2598; Small Business and Federal Procurement Competition Enhancement Act of 1984, 98 Stat. 3072.

Congress mandated that the changes it made in technical data rights treatment apply to solicitations issued one year after date of enactment (19 October 1984) and on 10 September 1985 the Defense Acquisition Regulatory (DAR) Council issued a set of proposed rules to implement those changes. 50 Fed. Reg. 36,887 (1985); Defense Procurement Reform Act of 1984, 98 Stat. 2599 (§ 2323(c)(2)). The proposed rules constituted a complete rewrite of DFARS Subpart 227.4 to accommodate language set forth in Pub. L. Nos. 98-525 and 98-577. Section 227.471 of the proposed rules defined "developed at public expense" as data "brought to a point of practical application," i.e., "which had been constructed, practiced, or used, and tested so as to clearly demonstrate that it performs the objective for which it was developed," and was accomplished without direct government payment at a time when no government contract required performance of the development effort and the effort was not part of performing a government contract. Comments upon the proposed rules were to be submitted by 9 October 1985. 50 Fed. Reg. 36,887 (1985).

On 24 October 1985, the DAR Council decided not to implement the proposed rules after the consensus of a meeting with representatives of industry, congressional staffs, the press and the government was that the comment period was "too short." The DAR Council extended the public comment period to January 1986 and issued a temporary interim revision incorporating minimal statutory requirements until a final version of the rules could be implemented. No definition for "developed at private expense" was set forth in the interim rules. The interim rules, however, addressed the statutory challenge provision. They stated, after a CO determines that a challenge to a restrictive marking is warranted, the CO shall send a written challenge notice to the contractor or subcontractor; any written response from the contractor or subcontractor shall be considered a claim within the meaning of the CDA that must be certified regardless of dollar amount; the CO shall issue a final decision stating whether the restrictive marking(s) challenged are valid or not valid; and the government will continue to be bound by the restrictive marking for a period of 90 days from issuance of the final decision or longer if the contractor submits to the CO a notice of intent to file suit. 50 Fed. Reg. 43,158 (24 October 1985) (DFARS 227.413-1(c)); 50 Fed. Reg. 41,180 (9 October 1985).

During October 1986, the House of Representatives and Senate agreed to specifically require DoD to publish regulations defining the terms "developed" and "at private expense." They stated:

> Efforts to define the terms have been ongoing since 1962 without resolution. Because of the lack of definitions in the Federal Acquisition Regulations and the Defense Supplement to those regulations, the military departments have differed in their approach on the issue. The conferees agreed that a uniform approach throughout the [DoD] was desirable and necessary....

The conferees believe that previously proposed [DoD] regulations published for public comment September 10, 1985, defined the term "developed" in an excessively, stringent manner by requiring an "actual reduction to practice" – a term of art used to establish an inventor's priority rights under the patent laws. The conferees agree that, for purposes of determining whether an item or process has been developed at private expense, an item should generally be considered "developed" if the item or process exists and reasonable persons skilled in the applicable art would conclude that a high probability exists that the item or process will work as intended. The conferees determined, however, that because circumstances may exist in which such a standard may be inappropriate, crafting of more exact parameters would be better accomplished through the regulatory process.

In addition, the conferees agree that as a matter of general policy "at private expense" development was accomplished without direct government payment. Payments by the government to reimburse a contractor for its indirect costs would not be considered in determining whether the government had funded the development of an item. Thus, reimbursement for Independent Research and Development expenses and other indirect costs . . . , although such payments are in indirect support of a development effort, are treated for purposes of this Act as contractor funds.

H.R. Rep. No. 99-1001, at 510-11 (1986 Conf. Rep.). With respect to validation of proprietary data restrictions, Congress amended section 2321 of title 10 (Validation of Proprietary Data Restrictions) to provide:

(b)(1) The Secretary of Defense shall ensure that there is a thorough review of the appropriateness of any restriction on the right of the United States to release or disclose technical data delivered under a contract to persons outside the Government, or to permit the use of such technical data by such persons. Such review shall be conducted before the end of the three-year period beginning on the date on which the final payment is made on a contract under which technical data is required to be delivered, or the date on which the technical data is delivered under such contract, whichever is later.

18

DoD Authorization Act, 1987, Pub. L. No. 99-661, 100 Stat. 3816, 3951 (contained in identical form in Joint Resolution making appropriations for FY 1987 and other purposes, Pub. L. No. 99-500, 100 Stat. 1783-171). Congress added that, notwithstanding the three-year limitation, "the United States may challenge a restriction on the release, disclosure, or use of technical data delivered under a contract at any time if such technical data—(i) is publicly available; (ii) has been furnished to the United States without restriction; or (iii) has been otherwise made available without restriction." 100 Stat. 3952.

Beginning in 1987, after considerable discussion and debate regarding DoD technical data policy, DoD published a series of draft and interim regulations to reform its technical data policies and procedures. *E.g.,* 52 Fed. Reg. 12390 (16 Apr. 1987); 52 Fed. Reg. 2082 (16 Jan. 1987). For the first time, DoD added a new category or type of license (Government Purpose License Rights) to the two existing categories or types ("limited" rights if developed exclusively at private expense and "unlimited" rights if developed with federal funds) in an attempt to address the legitimate rights of DoD and contractors in technical data where there was "mixed funding" of development. If a contractor's contribution to an item or process developed in part with federal funds and in part at private expense was significant (more than 50%), DoD generally was to receive Government Purpose License Rights, rather than unlimited rights as provided under existing policy. 52 Fed. Reg. 2082 (DFARS 227.472-5, Standard Rights in Technical Data; 252.227-7013(b)(2), RIGHTS IN TECHNICAL DATA). During December 1987, in enacting the National Defense Authorization Act for FYs 1988 and 1989, § 808, 101 Stat. 1019, 1128-29, Congress provided further guidance to DoD regarding the definition of developed exclusively at private expense, mandating that, in defining such terms, the Secretary shall specify the manner in which indirect costs shall be treated and shall specify that amounts spent for independent research and development and for bid and proposal costs shall not be considered to be federal funds for purposes of the definitions.

On 1 April 1988, the DAR Council again issued interim rules for Subpart 227.4 and Part 252 of the DFARS. The new interim rules, among other things, implemented section 808 of the National Defense Authorization Act for FYs 1988 and 1989 and direction from the Deputy Assistant Secretary of Defense (Procurement) that DFARS Subpart 227.4 be simplified and streamlined. 53 Fed. Reg. 10780.

On 28 October 1988, after evaluating public comments received, the DAR Council issued another interim rule replacing in its entirety the interim ruled published on 1 April 1988. 53 Fed. Reg. 43698 (28 Oct. 1988). Among the changes made to the rule was that "notification and listing procedures" were revised to simplify and clarify the process for establishing rights in data. This coverage was altered to "clarify that the listing process does not accelerate the validation process and is not a final

19

determination of rights." DFARS 227.473-1, Procedures for Establishing Rights in Technical Data, of the new interim rule provided in part:

(2) **Preaward Notification.**

    (i) The offeror is required to identify, in its proposal, items, components, processes or computer software which it intends to use and which would result in delivery of technical data to the Government with other than unlimited rights....

    ....

(3) **Contract award.**

    (i) The contractor's notification will serve as the basis for the list to be included in the contract identifying all technical data with restrictions on the Government's right of use or disclosure that is required by paragraph (k) of the clause at 252.227-7013.

    ....

    (iii) **The purpose of the list is to facilitate the review of contractor assertions required by 10 U.S.C. [§] 2321 and to provide a basis for Government acquisition planning. It is not a final determination of rights and does not alter the rights of the parties** under 10 U.S.C. [§§] 2320 or 2321.

    ....

(6) **Supporting information. The [CO] should rely on the representation provided with the contractor's notification. Detailed supporting information, either preaward or postaward, should normally not be requested unless there are reasonable grounds to question the validity of the assertion.** While the contractor or subcontractor is obligated to provide sufficient information to fully justify the assertions, the [CO] should only obtain enough information to determine if the assertion is reasonable and to evaluate

> its likely impact on the Government. [Emphasis Added]

With respect to validation of restrictive markings on technical data, DFARS 227.473-4 of the new interim rule provided:

> The clause at 252.227-7037 sets forth rights and procedures pertaining to the validation of restrictive markings asserted by contractors and subcontractors on deliverable technical data and shall be included in all solicitations and contracts which require the delivery of technical data. The Government should review the validity of any asserted restriction on technical data deliverable under a contract. **This review should be accomplished** before acceptance of the technical data but **no later than three years after final payment or three years after delivery of the technical data to the Government, whichever is later.** The [CO] may challenge restrictive markings if there are reasonable grounds to question their validity but only if the three-year period has not expired. However, the Government may challenge a restrictive marking at any time if the technical data (1) is publicly available; (2) has been furnished to the United States without restriction; or (3) has been otherwise made available without restriction. **Only the [CO's] final decision resolving a formal challenge constitutes "validation" as addressed in 10 U.S.C. [§] 2321. A decision by the Government not to challenge a restrictive marking or asserted restriction does not constitute "validation."**

*Id.* (Emphasis added) The RIGHTS IN TECHNICAL DATA AND COMPUTER SOFTWARE clause, DFARS 252.227-7013, in the new interim regulation provided in part:

> **(k) Identification of restrictions on Government rights.** Technical data and computer software shall not be tendered to the Government with other than unlimited rights, unless the technical data or computer software are identified in a list made part of this contract. This list is intended to facilitate review and acceptance of the technical data and computer software by the Government and does not change, waive, or otherwise modify the rights or obligations of the parties under the clause at DFARS 252.227-7037. As a minimum, this list must –

21

(1) Identify the items, components, processes, or computer software to which the restrictions on the Government apply;

(2) Identify or describe the technical data or computer software subject to other than unlimited rights; and

(3) Identify or describe, as appropriate, the category or categories of Government rights...on the use of disclosure of the technical data or computer software.

The VALIDATION OF RESTRICTIVE MARKINGS ON TECHNICAL DATA clause, DFARS 252.227-7037, in the new interim regulation provided in part:

**(b) Justification.** The Contractor or subcontractor at any tier is responsible for maintaining records sufficient to justify the validity of its markings that impose restrictions on the Government and others to use, duplicate, or disclose technical data delivered or required to be delivered under the contract or subcontract, and shall be prepared to furnish to the [CO] a written justification for such restrictive markings in response to a challenge under paragraph (d) below.

....

**(d) Challenge.**

(1) Notwithstanding any provision of this contract concerning inspection and acceptance, if the [CO] determines that a challenge to the restrictive marking is warranted the [CO] shall send a written challenge notice to the Contractor or subcontractor asserting the restrictive markings....

....

**(3) The Contractor's or subcontractor's written response shall be considered a claim within the meaning of the Contract Disputes Act of 1978 (41 U.S.C. [§§] 601 et seq.) and shall be**

22

certified...regardless of dollar amount.
[Emphasis added]

In December 1991, Congress enacted DoD Authorization Act, FY 1992 and 1993, § 807, 105 Stat. 1290, 1421-23, requiring the Secretary of Defense to form a government-industry advisory committee to develop recommended regulations to supersede the interim regulations implementing requirements of 10 U.S.C. § 2320, Rights in Technical Data. After holding meetings between July 1992 and December 1993, the advisory committee mandated by Congress concluded existing regulations were a disincentive to companies that create new technology with their own funding to furnish such technology to DoD. The Committee developed revised regulations that it believed established a balance between data developers' and data users' interests, and would encourage both creativity and firms to offer newly developed technology to DoD since it deemed protection of privately developed data crucial for developers, especially those with limited product lines. 59 Fed. Reg. 31584 (20 June 1994).

On 20 June 1994, the DAR Council published for public comment regulations adopting the recommendations of the Government-Industry Technical Data Advisory Committee established pursuant to the National Defense Authorization Act for FYs 1992 and 1993. The proposed regulations identified any government rights in technical data or computer software as specific nonexclusive, license rights a contractor has granted the government. 59 Fed. Reg. 31585, 31587. They defined standard license rights in proposed clauses set forth at DFARS 252.227-7013, RIGHTS IN TECHNICAL DATA—NONCOMMERCIAL ITEMS, and 252.227-7014, RIGHTS IN NONCOMMERCIAL COMPUTER SOFTWARE AND NONCOMMERCIAL COMPUTER SOFTWARE DOCUMENTATION. 59 Fed. Reg. at 31605-07, 31608-11. The rules stated that a contractor retains all rights not granted to DoD. 59 Fed. Reg. 31587 (DFARS 227.4034(a)). They added a new Subpart 227.5, Rights in Computer Software and Computer Software Documentation. 59 Fed. Reg. at 31597-604. The proposed rules set forth a standard Government Purpose Right applicable in all mixed funding situations allowing DoD to use such data for "governmental purposes" (including competition but not commercial use), with the government acquiring "Unlimited Rights" in that data only five years following award of the development contract or subcontract or a period negotiated by the parties. 59 Fed. Reg. at 31588. Existing regulations required that indirect costs of development be considered "government funded" if development was required for performance of a government contract (53 Fed. Reg. 43698, DFARS 227.471, Definitions (Oct 1988) ("developed exclusively at private expense")), but the 1994 proposed rules specified development accomplished with costs charged to indirect cost pools be considered development accomplished at "private expense." 59 Fed. Reg. at 31608. The proposed rules also added a new clause (DFARS 252.227-7015, TECHNICAL DATA—COMMERCIAL ITEMS) that generally required DoD to acquire technical data pertaining to "commercial" items or processes only customarily provided to the public. 59 Fed. Reg. at 31586 (DFARS 227.402-1), at 31611-12. The proposed rules (DFARS 227.403-13) did not make any significant alterations to DoD's right to

review, verify, challenge and validate asserted restrictions on technical data use set forth in existing regulations. *Compare* 59 Fed. Reg. 31592-93, 31617-18, 31620, *with* 53 Fed. Reg. 43698 (Oct. 1988) (DFARS 227.473-1, Procedures for Establishing Rights in Technical Data; and 227.473-4, Validation of Restrictive Markings on Technical Data).

In October 1994, Congress passed the Federal Acquisition Streamlining Act of 1994 (FASA), Pub. L. No. 103-355, 108 Stat. 3243, to revise and streamline Federal government acquisition laws. Among other things, FASA modified 10 U.S.C. § 2320(b) to provide a presumption of development at private expense for commercial items, and added a new subsection (f) to 10 U.S.C. § 2321 specifying that, under "commercial item" contracts, a CO must presume private expense development whether or not the contractor submits a justification in response to a challenge notice. The subsection also provided that challenges under contracts for "commercial items" can be sustained only if information furnished by DoD demonstrates that the item was not developed exclusively at private expense.

During June 1995, the DAR Council amended the DFARS to prescribe final technical data regulations (previously published in June 1994 for comment as interim rules) with changes made in the rules necessitated by FASA and based on comments received. 60 Fed. Reg. 33464 (28 June 1995). The final rule revised the 1988 interim guidance on rights in technical data, and added new guidance on rights in computer software and software documentation intended to replicate commercial practice. The rule deleted DFARS Subpart 227.4, Rights in Data and Copyright, and replaced that subpart with Subpart 227.71, Rights in Technical Data. 60 Fed. Reg. 33469-70. The new rule made several major changes from the 1988 rule, including separate treatment for commercial and noncommercial technical data, a requirement to grant government purpose rights (GPR) (previously known as "government purpose license rights" or GPLR) in all mixed funding situations, and direction to determine funding at the lowest segregable level of an item, component, or process. *Compare* DFARS 252.227-7013(a)(11), (12), (b)(2) (1988), *with* DFARS 252.227-7013(a)(7)(i), (11), 252.227-7014(a)(7)(i), 252.227-7015 (1995).

Because DoD has unique needs for technical data created by its missions, it is exempt from the standard FAR rules regarding technical data and follows only rules set forth in the DFARS. FAR 27.400; DFARS 227.400. DFARS Subparts 227.71 (Rights in Technical Data), and 227.72 (Rights in Computer Software and Computer Software Documentation) set forth a unique process for acquisition of intellectual property (IP) license rights in technical data or computer software developed and/or delivered under a contract. In general, a contractor (developer of IP) retains title to its developed IP and DoD receives from the contractor a nonexclusive license to use, reproduce, modify, release, perform, display, or disclose the technical data or software.

The DFARS essentially set forth three different levels of DoD license rights in noncommercial technical data based on source of funding for data development:

limited; unlimited; and government purpose rights. If the data pertain to an item or process developed exclusively with government funding, DoD receives unlimited rights and may use, modify, reproduce, perform, display, release or disclose the data to anyone and for any purpose. DFARS 252.227-7013(a)(15). If the data pertain to an item or process developed exclusively with private funding, DoD receives limited rights and may not share the information with anyone outside DoD unless that disclosure is temporary and made merely to satisfy one of DoD's limited internal needs, such as reviewing competitive contract proposals or performing an emergency overhaul. DFARS 252.227-7013(a)(13); 10 U.S.C. § 2320(a)(2)(D)(i). If the data pertain to an item or process developed with both government and private funding, DoD receives GPR for five-years or other negotiable period and may use, modify, reproduce, perform, display, release, or disclose the data within the government without restriction and release or disclose that data to any person or entity outside DoD only for government purposes. DFARS 252.227-7013(a)(11); 252.227-7013(a)(12)(i), (ii). After expiration of five years or the period negotiated, the GPR in technical data reverts to unlimited rights. DFARS 252.227-7013(b)(2)(i), (ii). While technical data can be provided with limited rights, the computer software and software documentation clause does not contain this choice but instead includes a "restricted rights" license that is substantially similar to that set forth in the FAR data rights clause. DFARS 252.227-7014(a)(14).

The technical data rights system created by statute and regulation gives DoD unlimited rights in noncommercial technical data delivered under DoD contracts unless a contractor takes various affirmative actions to limit such rights both before and after contract award. DFARS 227.7103-5(a)(7); 252.227-7013(b)(1)(vii). A contractor providing non-public information to DoD must act to protect the non-public nature of that information or accept loss of any right to have it protected. *See, e.g., Campbell Plastics Eng'g & Mfg. v. Brownlee*, 389 F.3d 1243, 1247-48 (Fed. Cir. 2004); *Bell Helicopter Textron*, 85-3 BCA ¶ 18,415 at 92,430-32.

Pursuant to 10 U.S.C. § 2320(b)(5), DFARS 227.7103-3(b) and 227.7203-3(b) of the final rule mandate inclusion of DFARS 252.227-7017 in all solicitations for noncommercial items requiring offerors to identify in their offers technical data, computer software, and software documentation for which restrictions upon use, release, or disclosure (other than copyright) would be asserted and to attach a list of those assertions to their offers. DFARS 252.227-7017(d) specifies the attached list state, among other things, the technical data or computer software to be furnished with restrictions, basis for the offeror's assertion of restriction (e.g., development of item in whole or in part at private expense), and the asserted rights category (e.g., limited or government purpose rights). DFARS 227.7103-4(b) and 227.7203-4(b), License Rights, explain (for technical data pertaining to items, components, or processes, and for computer software or computer software documentation, respectively) that the scope of the license acquired by DoD is generally determined by the source of funds used for development and that determination of source of development funds should be made "at any practical subitem or subcomponent level or for any segregable portion of

a process" for technical data and the "lowest practicable segregable portion" of software or documentation.

When acquiring and specifying technical data, software, and software documentation, DoD utilizes a Contracts Data Requirements List (CDRL), DD Form 1423, to satisfy in part statutory and regulatory mandates to establish to the extent practicable technical data and software to be delivered under a contract. DFARS 215.470(b). Prior to award of a contract, a contractor lists on a CDRL all the noncommercial technical data and computer software that the contract names as unlimited rights deliverables that the contractor intends to deliver with less than unlimited rights. DFARS 252.227-7013(e)(2), (3); 252.227-7014(e)(2), (3). The contractor must disclose its asserted rights category for each such data item and the basis for its assertions. DFARS 252.227-7017(b), (d). DoD may use the list during source selection to evaluate the impact of contractor identified restrictions on DoD evaluation factors. DFARS 227.7103-10(a)(5); 227.7203-10(a)(5); Office of the Under Secretary of Defense for Acquisition, Technology, and Logistics, *Intellectual Property: Navigating Through Commercial Waters*, 2-5 (2001). Facts and theories behind the contractor assertions are handled when needed in other processes and by other clauses. DFARS 227.7103-10(a)(2); 227.7103-13; 227.7203-10(a)(2); 227.7203-13. Prior, future, or contemporaneous rights asserted under other contracts do not provide a certain basis for determining DoD's rights under the current contract. A prior list assertion (unless formally challenged and resolved) is merely a contractor's position based upon then existing facts and/or assumptions. DFARS 227.7013-13(a); 227.7103-13(c)(8) (only a CO's final decision or actions of the ASBCA or court of competent jurisdiction sustaining validity of asserted restriction constitutes validation); 227.7203-13(e)(2) (same). CDRL assertions simply represent the unilateral claim of the contractor regarding allocation of rights for noncommercial technical data or software. *See* DFARS 227.7103-10(a)(4); 227.7203-10(a)(4); 227.7103-13(a); 227.7203-13(a); 252.227-7013(e)(4); 252.227-7014(e)(4). They are not immediately binding upon DoD, which can challenge those assertions even after final payment under the contract. DFARS 227.7103-10(a)(4); 227.7103-13(a), (c)(1); 227.7203-10(a)(4); 227.7203-13(a), (d)(2); 252.227-7013(e)(4); 252.227-7014(e)(4); Under Secretary of Defense, *Intellectual Property* at 2-5 thru 2-6.

A properly asserted pre-award assertion list made in good faith by a contractor must be attached to the contract at award. *See* DFARS 252.227-7013(e)(2); 252.227-7014(e)(2); 252.227-7017(f). A contractor is allowed to update that attachment only if there is new information or an inadvertent omission in drafting the list that would not have materially affected the source selection. The factual determination as to whether either of the two conditions exist is for the CO to make and any update of the attachment can only be made by CO contract modification. DFARS 252.227-7013(e)(3), (4); 252.227-7014(e)(3), (4). A contractor who fails to make a proper pre-award assertion and who later cannot satisfy one of the two tests for updating the pre-award assertions is

required to deliver all such noncommercial data and software with unlimited rights. *See* DFARS 227.7103-5(a)(7); 252.227-7013(b)(1)(vii), (e)(2), (3); 252.227-7014(e)(2), (3).

After award of a contract, a contractor must mark noncommercial technical data or software it delivers with an authorized marking in an authorized manner showing that the data or software is submitted in confidence to actually receive protection for its data or software. Failure to so mark the data results in delivery of the data with unlimited rights. *See* DFARS 227.7103-10(c)(1); 227.7203-10(c)(1); 252.227-7013(f)(2)-(4); *accord Xerxe Group, Inc. v. United States*, 278 F.3d 1357, 1360 (Fed. Cir. 2002); *General Atronics Corp.*, ASBCA No. 49196, 02-1 BCA ¶ 31,798 at 157,067; *Bell Helicopter*, 85-3 BCA ¶ 18,415 at 92,409, 92,432-33; *Wayne H. Coloney Co.*, B-211789, 83-2 CPD ¶ 242 (Comp. Gen. 23 Aug. 1983). If a contractor shows it inadvertently delivered unmarked data to DoD and agrees to relieve DoD of liability pertaining to the unmarked data, it can ask the CO for permission to subsequently mark the data at its own expense if that request is made within six months of submission. DFARS 227.7103-10(c)(2); 227.7203-10(c)(2).

Markings must be placed "on the transmittal document...and...each page of the printed material containing data for which restrictions are asserted." DFARS 227.7103-10(b); 252.227-7013(f)(1); 252.227-7014(f)(1). A contractor may apply a restrictive legend ONLY to those portions of the data/software/page covered by an authorized assertion. DFARS 252.227-7013(f)(1). When such markings are not so limited to only the restricted portions of a page, the markings are "nonconforming." Under Secretary of Defense, *Intellectual Property* at 2-10 (alteration of prescribed content or format of marking results in marking being "nonconforming").

The DFARS provide the specific text for markings that may be placed on noncommercial technical data and software, and may specify the location where the marking must appear. DFARS 252.227-7013(f)(1), (2)-(4); 252.227-7014(f)(2), (3)-(4). Any alteration of the prescribed content or format of a marking results in the marking being "nonconforming." Under Secretary of Defense, *Intellectual Property* at 2-10.

There are three contractually recognized categories of legends—"justified," "unjustified," and "nonconforming." A justified legend is in a prescribed format authorized for use on the deliverable. *See* DFARS 227.7103-12(a)(1); 227.7203-12(a)(1). An "unjustified" legend is an unauthorized marking that does not depict accurately restrictions applicable. DFARS 227.7103-12(b)(2). A "nonconforming" legend is (a) an authorized marking that differs in form or substance from the contract marking requirements or (b) any marking which is not authorized by DFARS 252.227-7013 or 252.227-7014. DFARS 227.7103-12(a)(1); 227.7203-12(a)(1).

A contractor is prohibited from placing a restrictive marking or legend on any deliverable noncommercial technical data and computer software unless the contract contains an attachment acknowledging the restrictive assertion covering such

27

data/software. *See* DFARS 252.227-7013(e)(2); 252.227-7014(e)(2) (last sentence). A legend which is in a contract-specified format but which is not authorized for use due to failure to assert prior to delivery is a "nonconforming" legend. *See* DFARS 252.227-7013(e)(2); 252.227-7014(e)(2); 227.7103-12(a)(1); 227.7203-12(a)(1). In sum, when a contractor violates the procedural agreements of the parties' contract (such as making a proper assertion, using a proper legend format, or limiting application of the proper format to only that portion of the data covered by a proper assertion), that legend with regard to that data is "nonconforming."

Correction of nonconforming markings on technical data and computer software, respectively, are not subject to DFARS 252.227-7037, VALIDATION OF RESTRICTIVE MARKINGS ON TECHNICAL DATA; and 252.227-7019, VALIDATION OF ASSERTED RESTRICTIONS – COMPUTER SOFTWARE. Rather, nonconforming legends may be ordered removed or corrected by simple CO notification and a 60-day period to correct or comply. If a contractor fails to abide by the CO's order, it loses the right to assert any restriction on DoD's use and further disclosure of the data or software. DFARS 252.227-7013(h)(2); 252.227-7014(h)(2); 227.7103-11(a)(1), 12(a)(1), (2); Under Secretary of Defense, *Intellectual Property* at 4-19.

An unjustified marking is one that does not accurately characterize the restrictions that apply to a particular deliverable. For example, if a limited rights legend is placed on data for which DoD is entitled to receive GPR, that legend is unjustified (even if it conforms to the format and content for limited rights legends). DFARS 227.7103-12(b)(1); 227.7203-12(b)(1); Under Secretary of Defense, *Intellectual Property* at 4-18, 4-19. A CO has the right to review and challenge the validity of an unjustified marking. DFARS 227.7103-12(b)(2); 227.7203-12(b)(2); 252.227-7013(h); 252.227-7019(e)(1); 252.227-7037(e). Procedures for reviewing and challenging unjustified legends are set forth in DFARS 252.227-7019 for computer software and in DFARS 252.227-7037 for technical data, both of which are based on 10 U.S.C. § 2321.

To discourage contractors from simply marking all their designs and drawings with proprietary markings, Congress placed restrictions upon the right of contractors to mark data and codified the means of challenging marked data. Under 10 U.S.C. § 2321, Congress has specified a CO may review the validity of any restriction a contractor asserts on DoD use if the CO determines that reasonable grounds exist to question the current validity of the asserted restriction and continued adherence to the asserted restriction would make it impracticable to procure the item to which the technical data pertain. Congress further expressly specified a CO may initiate a challenge to a contractor asserted use restriction within three years (now six years, National Defense Authorization Act for FY 2012, Pub. L. No. 112-81, § 815(b)(1)(A), 125 Stat. 1492-93), of the date on which final payment is made upon the contract under which the technical data was required to be delivered or the date on which the technical data was actually delivered, whichever is later. 10 U.S.C. § 2321(d)(2)(B). A

28

challenge to an asserted use or release restriction may also be made after the end of period set forth by Congress if the technical data involved: is publicly available; has been furnished to the United States without restriction; or has otherwise been made available without restriction. 10 U.S.C. § 2321(d)(2)(A)(i)-(iii).

Congress has mandated that a contractor or subcontractor at any tier under a contract for the delivery of noncommercial data be prepared to furnish to a CO "written justification" for the restriction it asserts on the right of DoD to use such data. 10 U.S.C. § 2321(b). Any contract that entails delivery of technical data must include the Validation of Restrictive Marking on Technical Data Clause (DFARS 252.227-7037). DFARS 227.7102-3(c); 227.7103-6(e)(4); 227.7104-6(e)(4); 227.7203-6(f). That clause requires a contractor to setup and maintain a system of records that are "sufficient to justify the validity of its restrictive markings." DFARS 252.227-7037(c); 227.7103-11(b); *see* 10 U.S.C. § 2321(b). While 10 U.S.C. § 2321 provides for validation with respect to only technical data, DoD has issued a clause, DFARS 252.227-7019 providing a similar process for computer software, which also requires a contractor to setup and maintain a system of records that are "sufficient to justify the validity of any markings that assert restrictions on the Government's rights to use, modify, reproduce, perform, display, release or disclose." DFARS 252.227-7019(b).

If a CO believes there are reasonable grounds to question the validity of an asserted restriction, the CO is to send a written notice to the contractor that includes the CO's basis for questioning the assertion and notification that the contractor is to respond within 60 days. 10 U.S.C. § 2321(d)(3); DFARS 252.227-7037(e)(1); 252.227-7019(e). The contractor receiving such a notice is to possess the required records to prove what was "exclusively funded at private expense," and has a contractual obligation to have such proof on file and available. DFARS 252.227-7013(g); 252.227-7014(g); *see* DFARS 252.227-7013(g)(2); 252.227-7014(g)(2); 252.227-7017(f); 252.227-7019(f)(iii); 252.227-7037(b), (e)(3). If the contractor requires more than 60 days to respond, it may submit a written request for an extension of time detailing its need for more time. The CO shall grant extra time as appropriate. 10 U.S.C. § 2321(e).

The contractor's response to the CO's challenge is considered a "claim" under the CDA, which must be certified by the contractor for a technical data validation. DFARS 252.227-7037(e)(3); 10 U.S.C. § 2321(h).[2] When the contractor submits a

---

[2] We acknowledge that in *Alenia North America, Inc.*, ASBCA No. 57935, 13 BCA ¶ 35,296, an appeal where neither the letter contract nor "definitized" contract contained any DFARS or FAR data rights clauses, and the parties never adhered to the "validation" procedures expressly set forth in 10 U.S.C. § 2321 and DFARS 252.227-7037, we deemed a CO's final decision asserting the government possessed unlimited rights in technical manuals delivered by a contractor and directing the removal of the contractor's restrictive legend—stating that manual "must not be used for any purpose other than that for which it is supplied," "reproduced without written authorization," or "disclosed to unauthorized

response to the CO, the CO has 60 days to decide whether the justification submitted is valid. 10 U.S.C. § 2321(g)(2). If the CO determines the contractor failed to justify the asserted restriction, the CO is to issue a final decision sustaining the challenge and cancelling the restriction. 10 U.S.C. § 2321(i)(1)(A); DFARS 252.227-7019(f)(6)(i); 252.227-7037(g)(2)(ii). If the contractor fails to submit a response to the challenge regarding the asserted restriction, the CO also is to issue a final decision pertaining to the validity of the asserted restriction. 10 U.S.C. § 2321(g)(1); DFARS 252.227-7013(g)(2); 252.227-7019(f)(5). For 90 days after the issuance of a final decision, however, DoD must continue to abide by the contractor-asserted restriction to allow the contractor to commence an action before either this Board or provide notice of intent to file an action in the United States Court of Federal Claims pursuant to the CDA. DFARS 252.227-7019(g)(1)(i); 252.227-7037(g)(2)(ii).

By tying the validation to a final decision by a CO, Congress made the matter a "contract dispute," rather than an independent cause of action in federal district court. If the contractor wants to dispute the CO's challenge regarding technical data rights, it cannot assert the matter was "unrelated" to a contract action, as the contractor did in *Megapulse, Inc. v. Lewis,* 672 F.2d 959 (D.C. Cir. 1982). Rather, it must appeal the CO's final decision in accordance with the CDA. 41 U.S.C. § 7104.

In sum, pursuant to statutory procedures providing due process to a contractor, Congress has statutorily authorized a CO to cancel restrictions on DoD's right to use noncommercial technical data or software if, in response to a "challenge" by a CO, a contractor does not submit justification for those restrictions (claim by the contractor), the CO issues a final decision concluding the asserted restrictions are not valid, and any suit pursuant to the CDA with respect to the CO's final decision results in a court or board decision favorable to DoD. 10 U.S.C. § 2321(i)(A).

## DECISION

Cubic moves for summary judgment in this appeal contending that SPAWAR "expressly and unambiguously released the claim that is the subject of this Appeal" when it entered into a "global settlement" amicably resolving ASBCA Nos. 56097 and 56288, both of which concerned Contract No. N00039-03-C-0024 (app. mot. at 1). Cubic asserts that: "[SPAWAR's] claim is that Cubic's Limited Rights assertions in

persons"—to be a "government" claim. In so concluding to resolve a question of jurisdiction, we essentially relied on a line of precedent that this Board has jurisdiction to decide the respective rights of parties under a contract even though no monetary relief is sought. *E.g., Gen. Elec. Automated Sys. Div.,* ASBCA No. 36214, 89-1 BCA ¶ 21,195 at 106,959 (citing *Systron Donner, Inertial Div.,* ASBCA No. 31148, 87-3 BCA ¶ 20,066). We, therefore, do not consider *Alenia* to have addressed the nature of a claim under the validation procedures at issue here under 10 U.S.C. § 2321 and DFARS 252.227-7037 or relevant to this appeal.

certain technical data...delivered under the 2003...[CDLS] Contract...are invalid because Cubic cited 'mixed funding' as the basis of its assertions"; SPAWAR "knew or reasonably should have known of the basis of that claim...prior to the parties' execution of a Settlement Agreement related to the CDLS Contract in November 2008"; and SPAWAR's claim thus "accrued prior to the execution of the Settlement Agreement." According to Cubic, the settlement agreement "included plain and unambiguous mutual releases of all claims related to the CDLS contract" stating that "all matters and/or claims and potential matters and/or claims (whether known or unknown) arising out of, or incidental to, or relating to the [CDLS] Contract" were released and SPAWAR's validation "claim, asserted years after the parties executed the Settlement Agreement,...is barred by the release." (App. reply at 1-2)

SPAWAR responds that Cubic "cites and relies on select parts of the release of claims to assert that the language bars 'all claims,'" but fails to recognize "other parts of the Settlement Agreement" which state that the "release does not extend to any claims related to the Contract that may arise in the future." According to SPAWAR, the "claim [at issue in this appeal] arose *after*...the Settlement Agreement, and is therefore not barred by the release language in the Agreement which specifically reserved rights of parties to pursue claims related to the CDLS Contract that arise in the future." (Gov't opp'n at 8-9)

In arguing that the claim which is the subject of this appeal is barred because the claim (among others) was released, Cubic repeatedly contends the claim before us is a "SPAWAR" claim. It asserts that "the only question before the Board is the legal issue of whether the Government's data rights claim arose before the parties executed the[ir] Settlement Agreement" (*e.g.*, app. reply at 5-6). The basic premise underlying Cubic's assertion, however, is incorrect. The claim before us is not a SPAWAR claim, but a claim by Cubic.

After years of complaints that data furnished by contractors to the government with restrictions on use and disclosure was being made available by the government to others in contravention of the use and disclosure restrictions without an adequate legal remedy available to a contractor, Congress established by statute a specific procedure to resolve disputes regarding restrictions on use and disclosure of data that a contractor imposes on data furnished to the government. DoD subsequently incorporated those statutory provisions into its regulations and mandatory clauses for its contracts. As discussed above, during 1984, Congress specified as a matter of law a DoD contract providing for delivery of technical data shall provide: the contractor or subcontractor at any tier is to be prepared to furnish the CO a written justification for any restriction asserted by the contractor or subcontractor on the right of the government to use such data; and the CO may review the validity of any restriction asserted under the contract on the right of the government to use such data if the CO "determines that reasonable grounds exist to question the current validity of the asserted restriction" and that "continued adherence to the asserted restriction by the United States would make it

31

impracticable to procure the item competitively at a later time." Congress stated that, if after review the CO determines a challenge to an asserted restriction is warranted, the CO shall provide a written notice to the contractor or subcontractor challenging the restriction asserted and requiring submission of a response within 60 days justifying validity of the asserted restriction. The contractor's response to the CO's challenge regarding technical data validation is deemed a "claim" under the CDA, DFARS 252.227-7037(e)(iv)(3); 10 U.S.C. § 2321(h), which the contractor must certify, DFARS 252.227-7037(e)(iv)(3), and the CO shall issue a final decision upon that claim, DFARS 252.227-7037(g)(1), (2), which can be appealed to the U.S. Court of Federal Claims or this Board in accordance with the CDA, DFARS 252.227-7037(g)(2)(iv). Defense Procurement Reform Act of 1984, Pub. L. No. 98-525, 98 Stat. 2598. Likewise, if a contractor fails to submit a response in support of its challenged use restrictions, as occurred in this appeal, in order to preclude a contractor from being able to prevent the resolution of a challenge to the validity of use restrictions, Congress also expressly specified the CO shall issue a final decision on the validity of the challenged use restrictions, which can then be appealed to the Court of Federal Claims or this Board in accordance with the CDA. *Id.*

In requiring a contractor or subcontractor to furnish "written justification" for a restriction asserted on use of noncommercial data or software furnished pursuant to a contract and specifying the contractor's written submittal will be treated as a "claim" under the CDA, Congress clearly placed the burden of proof for validating a use or release restriction on a contractor or subcontractor and established that the "validation" of such restrictions under contracts subject to 10 U.S.C. § 2321 containing a DoD "validation" clause, as here, constitutes a "claim" by a contractor under the CDA. Accordingly, the issue in this appeal is not whether a "claim" by SPAWAR is barred by the release executed by the parties. Rather, the issue is whether Cubic's "claim" contending the restrictions it has asserted are valid and subsequent appeal by Cubic of the CO's final decision to the contrary is barred by the release executed by the parties over three years earlier.

"A release is a contract whereby a party abandons a claim or relinquishes a right that could be asserted against another." *E.g., Colorado River Materials, Inc. d/b/a NAC Construction*, ASBCA No. 57751, 13 BCA ¶ 35,233 at 172,991. The scope of a release, therefore, is a question of contract interpretation. *Id.* As with any question of contract interpretation, the first step is to examine the language used by the parties. *Bell BCI Co. v. United States*, 570 F.3d 1337, 1341 (Fed. Cir. 2009); *Dureiko v. United States*, 209 F.3d 1345, 1356 (Fed. Cir. 2000); *Tri-O, Inc. v. United States*, 28 Fed. Cl. 463, 470-71 (1993).

Two paragraphs of the parties' Settlement Agreement contain very broad language. As found above, the second whereas clause of the Agreement states:

32

[I]n the interest of resolving all matters relating to ASBCA Nos. 56097 and 56288, as well as all matters and/or claims and potential matters and/or claims (known or unknown) arising under or in regard to the Contract, and under the sound policy of law favoring the settlement of disputes, the parties understand and agree that the parties' agreements herein constitute and represent full consideration for and satisfaction of any and all matters and/or claims brought under ASBCA Nos. 56097 and 56288, **as well as all matters and/or claims or potential matters and/or claims (known or unknown) arising under or in regard to the Contract**. [Emphasis added]

Similarly, as found above, paragraph 15 of the Settlement Agreement states:

> This **Agreement is for the sole purpose of settling all claims and appeals arising out of, incidental to, or relating to the Contract**, and this Agreement shall not be cited or otherwise referred to by either Cubic or the Government in any proceedings, whether judicial or administrative in nature, except as is necessary to effect the terms of this Agreement. [Emphasis added]

Based on the language of the Agreement, Cubic asserts that the parties' "Settlement Agreement released 'all matters and/or claims and potential matters and/or claims (whether known or unknown) arising out of, or incidental to, or relating to the [CDLS] Contract'" (app. reply at 2). According to Cubic, it and SPAWAR executed a "global settlement agreement" in November 2008 to settle "all matters contained in ASBCA Nos. 56097 and 56288, as well as all matters and/or claims and potential matters and/or claims (whether known or unknown) arising out of, or incidental to, or relating to the [CDLS] Contract" (app. reply at 3, emphasis deleted). Cubic adds that the Agreement states that the parties intended the Agreement "to resolve all matters that were in any way related to or connected with the CDLS Contract" (app. mot. at 5; *accord* app. reply at 6 n.7 ("plain language of the Settlement Agreement makes clear that the parties intended the Agreement to resolve not only the matters in ASBCA Nos. 56097 and 56288, but 'all claims and potential claims resulting from or relating to the Contract'"). In sum, Cubic contends (at least initially in its briefs) that SPAWAR "executed a valid general release, and there is no reason for this Board to entertain the notion that [SPAWAR] harbored an unspoken, undocumented exception to that broad release" (app. mot. at 6).

As SPAWAR notes in its opposition to Cubic's summary judgment motion, however, it is undisputed that both of the express releases set forth in the Settlement Agreement for the parties (paragraphs 12 and 14) include the following language:

**"Notwithstanding anything to the contrary, this release does not extend to any claims related to the Contract that may arise in the future"** (emphasis added). SPAWAR contends in its opposition to Cubic's summary judgment motion that this language demonstrates the Settlement Agreement does not release "all claims" arising under or associated with the CDLS contract. (Gov't opp'n at 8-9)

Cubic is correct that general language similar to that set forth above indicates an intent to make an ending of every matter arising under or by virtue of the contract. *E.g., Augustine Med. Inc. v. Progressive Dynamics, Inc.*, 194 F.3d 1367, 1371-72 (Fed. Cir. 1999). "[A] general release precludes a party to the contractual armistice from renewing or initiating further combat." *H.L.C. & Assocs. Constr. Co. v. United States*, 367 F.2d 586, 590 (Ct. Cl. 1966) (quoting *United States v. William Cramp & Sons Co.*, 206 U.S. 118 (1907)).

The very release that Cubic relies upon as releasing "all claims and potential claims resulting from or relating to the Contract," however, also expressly states that, "[n]otwithstanding anything to the contrary, this release does not extend to any claims related to the Contract that may arise in the future." That language clearly qualifies the extent of the release. If the release of claims was intended to be unqualified, there would be no need for any such language of qualification. *E.g., Metric Constructors, Inc. v. United States,* 314 F.3d 578, 582 (Fed. Cir. 2002). It provides, in conjunction with the other release language, that Cubic and SPAWAR are both released by the other from all matters and/or claims or potential matters and/or claims (known or unknown) arising under or in regard to the contract, EXCEPT "any claims related to the Contract that may arise in the future." Bilateral contract Modification No. P00035 memorializing the parties' 2008 Settlement Agreement contained the same language set forth in the Settlement Agreement concerning CDLS contract claims arising in the future. As found above, paragraphs 12 and 14 of Modification No. P00035 state: "Notwithstanding anything to the contrary, this release does not extend to any claims related to the Contract that may arise in the future." The 2008 settlement agreement and subsequent bilateral contract modification, therefore, do not effect an ironclad or complete release of the parties from any and all claims relating to or arising under their CDLS contract, as Cubic suggests, but instead a "partial" release of claims.

Pursuant to its plain terms, the parties' release (set forth both in the Settlement Agreement and bilateral contract modification) does "not extend" to contract claims arising "in the future." We are not free to ignore the express language utilized by the parties in their Settlement Agreement (and repeated in the contract modification). It is well established that, in construing the Settlement Agreement, the agreement must be considered as a whole and interpreted in a way that harmonizes and gives meaning to all its words and provisions. *Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1057 (Fed. Cir. 1983); *Thanet Corp. v. United States*, 591 F.2d 629, 635 (Ct. Cl. 1979). An interpretation giving a reasonable meaning to all parts of an agreement is preferred to one leaving a portion of the agreement useless, inexplicable, inoperative,

34

void, insignificant, meaningless, or superfluous, or achieves a weird and whimsical result. *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (citing *Arizona v. United States*, 575 F.2d 855, 863 (Ct. Cl. 1978)). If we do not ignore the parties' language that "this release does not extend to any claims related to the Contract that may arise in the future," but construe that language as excepting from the parties' release CDLS contract claims that "arise in the future," we give a reasonable meaning to all parts of the parties' agreement in accordance with the principles of contract construction. *See id.*

It is the burden of the parties entering into a settlement agreement to expressly reserve in the agreement any rights that they wish to maintain beyond the date of the settlement agreement. If the parties intend to leave things open and unsettled, their intent to do so must be made manifest. *Augustine Med*, 194 F.3d at 1372. We believe the parties' language in their Settlement Agreement makes manifest their intent to create only a "partial" release of Contract claims, and to expressly reserve in the Settlement Agreement that the release of claims does not apply to "[CDLS] contract claims" that "arise in the future," i.e., their wish to maintain beyond the date of their Settlement Agreement their ability to pursue CDLS contract claims that "arise in the future." *Compare id., with Tri-O*, 28 Fed. Cl. at 470-71 (there is nothing in language of release to support a holding the parties contemplated a discharge of any subsequent claims); *Advanced Eng'g & Planning Corp.*, ASBCA Nos. 53366, 54044, 03-1 BCA ¶ 32,157 (releases incorporated as part of bilateral modification not "general" releases).

Cubic contends further in its summary judgment briefs that, even if the parties' release of claims is not a general release, the claim at issue in this appeal is barred by the Settlement Agreement release because it arose prior to the parties' execution of their Settlement Agreement, rather than after execution. Cubic states that SPAWAR knew or should have known it had a basis "to challenge Cubic's assertion of Limited Rights in CDLS technical data" when Cubic submitted its CDLS assertions table in 2002 asserting Limited Rights in data due to development of data with mixed funding. (App. mot. at 7, 8; app. reply at 7, 9) According to Cubic, because the stated basis of the rights asserted in its CDLS assertions table "is inconsistent—on its face—with the standard allocation of rights established by DFARS 252.227-7103," the "government possessed all the information necessary to assert its claim" when Cubic submitted the CDLS assertions table in 2002 (app. reply at 8).

Cubic, however, once again founds its arguments upon a false premise. This appeal is not to resolve a "government" claim. As discussed above, the claim that is before us is not a SPAWAR claim. Instead, pursuant to statute, 10 U.S.C. § 2321, regulations and contract clauses, DFARS 252.227-7037, this appeal constitutes a "validation" claim by Cubic pursuant to a process statutorily created by Congress and detailed in regulations and contract clauses by DoD to allow a contractor to validate its CDRL assertions of restrictions on government use and release of technical data and software.

35

For several decades, contractors furnishing technical data and software to the government complained that the government could remove restrictive use markings they placed upon their technical data and software without due process of law or any effective legal remedy available to a contractor to prevent such government action. *E.g.,* Nash & Rawicz, *Intellectual Property in Government Contracts* at 468; *Int'l Eng'g Co. v. Richardson,* 367 F. Supp. 640, 652-54 (D.D.C. 1973); *Int'l Eng'g Co., Div. of A-T-O, Inc. v. Richardson,* 361 F. Supp. 818, 823-25 (D.D.C. 1973) (existing procedure "seriously lacking in adequate standards" for striking a restrictive legend, furnishing adequate notice of specific objections by a CO, and allowing contractor opportunity to present evidence and to cross-examine adverse witness), *rev'd on other grounds,* 512 F.2d 573 (D.C. Cir. 1975), *cert. denied,* 423 U.S. 1048 (1976). As the D.C. Circuit Court of Appeals explained in *Aktiebolaget Bofors v. United States,* 194 F.2d 145 (D.C. Cir. 1951):

> The owner of an unpatented trade secret has a property right in it as long as he does not disclose it. His right to the exclusive use of it depends upon the continuance of secrecy. Any person who obtains the secret from him by...unlawful means violates his property right and commits a tort....

> ...[O]ne who has lawfully acquired a trade secret may use it in any manner without liability unless he acquires it subject to a contractual limitation or restriction as to its use. In that event a licensee who uses the secret for purposes beyond the scope of the license granted by the owner is liable for breach of contract, but he commits no tort, because the only right of the owner which he thereby invades is one created by the agreement of disclosure. The owner could not maintain a suit against him for damages arising from unlicensed use without pleading and proving the contract. This being true, the gist of the owner's action is the breach of the licensing agreement.

Established precedent for nearly a third of a century, therefore, held that the only remedy available to a contractor contending the government was disclosing or had disclosed technical data furnished the government with restrictions upon disclosure and use was a suit for breach of contract, i.e., receipt of money damages. *Int'l Eng'g,* 512 F.2d 573, *cert. denied,* 423 U.S. 1048 (1976); *Williams Int'l Corp. v. United States,* 7 Cl. Ct. 726, 730-31 (1985); *Baldwin-Lima Hamilton Corp.* 50 Comp. Gen. 271 (13 Oct. 1970) (Federal Tort Claims Act exempts claims arising out of interference with contract rights; if licensee's use exceeds that permitted by license, licensor's remedy lies in contract); Farmakides, *Technical Data in Government Contracts,* 8 Wm. & Mary L. Rev. at 575. Many contractors did not

consider money damages for contract breach to be an adequate legal remedy because they desired to preclude the public release of their trade secret or technical data by the government to avoid significant future economic harm to their business. The U.S. courts of appeals however held availability of a legal remedy under the Tucker Act, 28 U.S.C. § 1491, for contract breach precluded contractors from maintaining an action against the government in district court under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, or another legal provision. *Int'l Eng'g*, 512 F.2d at 577-80; *Aktiebolaget*, 194 F.2d at 148-50. In 1982, relying upon a recent Supreme Court decision holding a party seeking to bar an agency's disclosure of information it had supplied that agency has no cause of action in a district court under the Freedom of Information Act (FOIA), 5 U.S.C. § 552; *Chrysler Corp. v. Brown*, 441 U.S. 281, 294 (1979), or the Trade Secrets Act, 18 U.S.C. § 1905, *Chrysler*, 441 U.S. at 316-17, but may seek review of the agency's action in district court and potentially obtain an injunction against that action pursuant to the APA, *Chrysler*, 441 U.S. at 317, the D.C. Circuit held for the first time in *Megapulse*, 672 F.2d 959, that a contractor could maintain an action pursuant to the APA and Trade Secrets Act for an injunction against an agency barring release of the contractor's data because monetary relief based on breach of contract was not an adequate remedy under the facts of the appeal. While recognizing an action against the United States "which is at its essence a contract claim" lies within the Tucker Act and "a district court has no power to grant injunctive relief in such a case," 672 F.2d at 967, the D.C. Circuit further determined that the action before it by a government contractor did not present a "disguised contract action" cognizable only elsewhere. *Id.* at 968.

Less than two years after the D.C. Circuit's decision in *Megapulse*, Congress enacted legislation which expressly provided contractors furnishing technical data to government agencies with a statutory and regulatory process providing them with due process prior to a CO removing one of their legends restricting use of data furnished. 10 U.S.C. § 2321; 41 U.S.C. § 253d; Anderson, *Comparative Analysis of Intellectual Property Issues*, 33 Pub. Cont. L.J. at 47. By statute, Congress specified that contracts for supplies or services identify in advance of delivery to the maximum extent practicable technical data which is to be delivered with restrictions on the right of the United States to use such data. 10 U.S.C. § 2320(b)(5). To satisfy this statutory mandate (and related regulatory requirements), a contractor lists on a CDRL all noncommercial technical data and computer software that the contract names as unlimited rights deliverables that the contractor intends to deliver with less than unlimited rights, specifically disclosing the asserted rights category for each data item and the basis for its assertions. DFARS 252.227-7013(e)(2), (3); 252.227-7014(e)(2), (3); 252.227-7017(b), (d). Pursuant to the statutory and regulatory framework, the CDRL becomes part of the parties' contract (DFARS 227.7103-10(a)(3); 227.7203-10(a)(3); 252.227-7013(e)(2); 252.227-7014(e)(2); 252.227-7017(f)), the contractor must mark noncommercial technical data or software it delivers with an authorized marking in accord with its CDRL assertions (DFARS 227.7103-10(b)(1), 227.7203-10(b)(1)), and the contractor must maintain records sufficient to justify the validity of its CDRL assertions and markings that impose restrictions on the government's right to use, duplicate or disclose technical data delivered or required to be delivered. 10 U.S.C. § 2321(b); DFARS 252.227-7037(c).

Assertions set forth on a CDRL are not binding on the government. They are simply the unilateral claim of a contractor regarding allocation of rights for noncommercial technical data or software. *See* DFARS 227.7103-10(a)(4); 227.7203-10(a)(4); 227.7103-13(a); 227.7203-13(a); 252.227-7013(e)(4); 252.227-7014(e)(4). They are not binding on DoD, which is free to issue a challenge to the assertions even after it has made final contract payment. 10 U.S.C. § 2321(c)(2)(A), (d); DFARS 227.7103-10(a)(4); 227.7103-13(a), (d)(4), (8) (only a CO's final decision or actions of the ASBCA or court of competent jurisdiction sustaining validity of asserted restriction constitutes validation); 227.7203-10(a)(4); 227.7203-6(f); 227.7203-13(a), (d)(2), (e)(2); 252.227-7013(e)(4); 252.227-7014(e)(4); Under Secretary of Defense, *Intellectual Property* at 2-5 thru 2-6.

Pursuant to the administrative process preceding a validation challenge, a CO may request a contractor or subcontractor informally explain the basis for its asserted restrictions, as occurred between the parties here. If the CO is not satisfied with the explanation received, as occurred here, the CO may request additional information be supplied, as also occurred here and appears to have resulted in the parties' July 2012 meeting at Cubic's facility. If the CO then makes a determination that (1) reasonable grounds exist to question the contractor's rights assertion and (2) continued adherence to the asserted restriction could make it impracticable to competitively procure the item, the CO may issue to the contractor a written "challenge" regarding the rights assertion. 10 U.S.C. § 2321(b)(2)(A); DFARS 227.7103-13(c)(1), (d)(2), (4); 252.227-7037(d)(1), (2), (e); 252.227-7019(d)(1), (2), (3); Nash & Rawicz, *Intellectual Property in Government Contracts* at 469.

Only if this standard is met is the CO free to issue a written statement challenging the contractor's assertion setting forth the CO's specific grounds for questioning the use assertion(s) and seeking within 60 days production by the contractor to the CO of records sufficient to justify the validity of its restrictive marking(s). 10 U.S.C. § 2321(b), (d)(3); DFARS 227.7103-11(b), (d)(4); 252.2277037(c), (e)(1); 252.227-7019(b). A contractor's production of records seeking to justify the validity of the restrictive marking(s) is, by law, considered to be a "contractor" claim under the CDA. DFARS 252.227-7037(e)(iv)(3); 10 U.S.C. § 2321(b), (h). The CO will then issue a final decision on the contractor's claim. 10 U.S.C. § 2321(g)(2); DFARS 252.227-7037(g).

Where a contractor, as here, fails to respond to a challenge, i.e., does not produce written justification to the CO for its asserted use restriction(s), Congress directs "the [CO] shall issue a [final] decision pertaining to the validity of the asserted restriction," despite the contractor's lack of response. 10 U.S.C. § 2321(g)(1); DFARS 252.227-7019(f)(5); 252.227-7037(f); Nash & Rawicz, *Intellectual Property in Government Contracts* at 1376. Thus, a contractor cannot prevent determination of the validity of its asserted use restriction(s) by failing to follow or adhere to the procedures set forth by Congress and DoD for such a determination.

The issuance of a final CO decision upon the validity of the asserted use restriction(s) allows a contractor to immediately obtain review of the CO final decision by this Board or the U.S. Court of Federal Claims. DFARS 252.227-7019(g)((i), (ii); 252.227-7037(g)(2)(iii), (iv); *see* 10 U.S.C. § 2321(h). Some scholars have described the resulting proceedings before this Board and the Court of Federal Claims as an "injunctive type proceeding." Nash & Rawicz, *Intellectual Property in Government Contracts* at 1374.

In accordance with statute, the contractor has the burden of proof on appeal (10 U.S.C. § 2321(b); DFARS 252.227-7019(b), (f)(iii); 252.227-7037(b)(2)(ii), (c), (e)(ii), (g)(i)), the standard of review is *de novo* (41 U.S.C. § 7104(b)(4)), and any determination by the board or court that is adverse to the contractor can be appealed to the U.S. Court of Appeals for the Federal Circuit. Until any appeal is concluded, DoD must leave restrictive markings intact and act in accordance with the restriction. If upon final disposition, the CO's challenge to the contractor's use or release restriction is not sustained, "the United States shall continue to be bound by the restriction." 10 U.S.C. § 2321(i)(2)(A); Sharp, *Layman's Guide to Intellectual Property*, 33 Pub. Cont. L.J. at 109; Nash & Rawicz, *Intellectual Property in Government Contracts* at 469-70; Chester D. Taylor & David W. Burgett, *Government Rights in Data and Software*, 88-3 Briefing Papers 22 (Feb. 1988).

As noted above, some scholars have described the resulting proceedings before us as an "injunctive type proceeding." Nash & Rawicz, *Intellectual Property in Government Contracts* at 1374. At this juncture, we need not characterize the nature of the proceedings Congress created before us, but note that our ultimate determination in such appeals – determination of the validity of a contractor's asserted use or release restriction(s) – will provide Cubic with (1) the due process sought by contractors before a government agency removes, obliterates or ignores a restrictive rights legend on data furnished it pursuant to a contract and (2) an adequate legal remedy, i.e., preclusion of an agency's removal, obliteration or disregard of a contractor's asserted use or release restriction if we determine the restriction to be justified. 10 U.S.C. § 2321(i)(2)(A) (government shall continue to be bound by restriction); DFARS 252.227-7019 (h)(2)(i) (same); 252.227-7037(h)(2)(i) (same); Nash & Rawicz, *Intellectual Property in Government Contracts* at 583 (counterpart FAR clause attempts to answer due process issues raised in *Int'l Eng'g Co.*, 367 F. Supp. at 653-54).

In sum, Congress and DoD have created a very specific, detailed process for validating a contractor's use or release restrictions. This process discourages COs from pursuing the validation of the restrictions prior to contract award and essentially encourages CO's to accept such restrictions during performance of a contract because a CO is not to issue a validation challenge until the CO can make two specific determinations, one of which concerns future re-procurement of the items procured. The process created by DoD and Congress encourages a CO to make informal inquiries of contractors if the CO has questions concerning a contractor's justification of a use or release restriction in an attempt to resolve such issues informally and inexpensively, and only allows a CO to issue a "written challenge" commencing a formal "validation"

of a use or release restriction after a CO can determine (1) reasonable grounds exist to question the contractor's rights assertion and (2) continued adherence to the asserted restriction could make it impracticable to competitively procure the item. If and when the CO is able to make these determinations, the CO can issue a written validation challenge to a contractor seeking production by the contractor within 60 days of records sufficient to justify the validity of its restrictive marking(s). By statute, Congress has specified that the contractor's response to the CO's challenge producing records intended to justify the validity of its restrictive marking(s) is to be treated as a "contractor" claim under the CDA and a CO is to issue a final decision on the validity of the restrictive marking(s). Where, as here, if the contractor fails to produce records to justify the validity of its restrictive marking(s), Congress has further specified that the CO is to proceed to issue a final decision that the marking(s) are not valid, thereby allowing a contractor to obtain review of the validity of the marking(s) *de novo* by either this Board or the Court of Federal Claims.

In asking us to hold that the action regarding validation of use or release restrictions before us arose in 2002 when Cubic submitted its table of restrictive marking (CDRL) assertions to SPAWAR and that table was appended to the parties' contract, Cubic essentially asks us to ignore the very specific, detailed statutory and regulatory framework set forth by Congress and DoD for the resolution of validation of use or release restrictions. As set forth above, Congress has determined that a contractor's response to a CO's challenge justifying the validity of its restrictive marking(s) is to be treated as a contractor "claim" under the CDA. A contractor cannot submit to a CO a response deemed by Congress as a "claim" or fail to submit a response to the CO until a CO issues a written validation challenge to the contractor with respect to the restrictive markings, and the CO cannot issue such a challenge to a contractor until the CO is able to determine (1) reasonable grounds exist to question the contractor's rights assertion(s) and (2) the government's continued adherence to the contractor's asserted restriction(s) may make it impracticable for the government to competitively procure the item.

We recognize, as Cubic asserts, that FAR defines "accrual" of a contract claim as "the date when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known." FAR 33.201. As the Court of Appeals explained in *Kellogg Brown & Root Servs., Inc. v. Murphy*, 823 F.3d 622, 626 (Fed. Cir. 2016), however, our "[p]recedent elaborates that whether and when a CDA claim accrued is determined in accordance with the FAR, the conditions of the contract, and the facts of the particular case." Fixing the date of accrual of a claim requires first that there is a "claim." Binding precedent illustrates that a claim does not arise for purpose of running a limitations period "if a claim cannot be filed because mandatory pre-claim procedures have not been completed." *Id.* (citing *Crown Coat Front Co. v. United States*, 386 U.S. 503, 510-12 (1967)) (pre-CDA case finding that the contractor's claim "first accrued...upon the completion of the administrative proceedings contemplated and required by the provisions of the contract"); *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferber Corp. of Calif., Inc.*, 522

40

U.S. 192, 200-02 (1997) (rejecting as "inconsistent with basic limitations principles" the position that a claim can arise and the limitations period commence when the claimant's suit would be premature because required pre-suit procedures had not taken place). In this appeal, mandatory pre-claim procedures, i.e., CO issuance of a written validation challenge to Cubic's asserted use and release restrictions and expiration of a period of at least 60 days for Cubic either to submit a response justifying its asserted use and release restrictions with documentation it was required by statute, regulation, and contract to have maintained to do so or Cubic to fail to submit such a response) did not occur until 2012, four years after the parties' execution of their 2008 release. Accordingly, the claim before us regarding validation of Cubic's use and release restrictions did not arise until after execution of the parties' release and comes within the expressly stated qualification or exception to that release for claims arising in the future.

Cubic suggests that if we determine the validation claim arose after the parties' Settlement Agreement we are ignoring the CDA, which governs claim accrual (app. reply at 9-10). The CDA, however, does not define claim or claim accrual. *See Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1575 (Fed. Cir. 1995) (en banc). Those terms are defined in the FAR (FAR 33.201, 52.233-1), which does not apply to DoD with respect to data rights issues. 10 U.S.C. § 2320(a)(1), (b)(3), (7). We note that the DFARS provisions, which are applicable to DoD with respect to data rights, set forth the administrative and contractual scheme regarding validation of contractor asserted restrictions created by Congress and DoD. According to Cubic, SPAWAR fails to cite any legal authority to support a conclusion by us here that a "specific statute" such as 10 U.S.C. § 2321 trumps the CDA, which Cubic states "confers the Board's jurisdiction" (app. reply at 9). We note it is a well-established principle of statutory interpretation that, a statute of specific intention takes precedence over a general statute, particularly if the specific statute was later enacted. *Brown v. GSA*, 425 U.S. 820, 834 (1976) (a precisely drawn statute pre-empts more general remedies). We do not, however, construe 10 U.S.C. § 2321 as "trumping" the CDA. With respect to validation of contractor restrictions, we believe our statutory interpretation reads both statutes together without conflict. *See, e.g., Kellogg Brown & Root*, 823 F.3d at 626. Cubic's asserted interpretation of the statutes, on the other hand, clearly conflicts with Congressional intent in enacting 10 U.S.C. § 2321. Congress expressly authorized a CO to issue a "validation challenge" to a contractor within "six years" after the final contract payment. 10 U.S.C. § 2321(d)(2) (2011). This authorization clearly is inconsistent with Cubic's suggestion that validation claims accrue or arise when a contractor's CDRL or data list becomes a part of the contract awarded since many if not most validation challenges would thereby be barred by the CDA's six-year statute of limitations long before the Congressionally-authorized period for bringing such challenges expired. *See, e.g.*, 41 U.S.C. § 7103(a)(4)(A); Carl Vacketta & Oliver Holmes, *Government Rights in Technical Data*, Briefing Papers, 84-12 Fed. Pubs. 7 (Dec. 1984) (not uncommon for government to contest contractor's classification of data five to ten years after original contract is complete).

We note that, with respect to government contracts, it is not unheard of to have claims arise after a contract has ended. *See* 10 U.S.C. § 2321(d)(2)(B) (validation challenge may now occur within six years after final contract payment); *Kellogg Brown & Root*, 823 F.3d at 629 (claim for subcontractor's costs accrued on a date after all subcontractor activity ended); *American Western Corp. v. United States*, 730 F.2d 1486, 1488 (Fed. Cir. 1984) (price reduction allowed after full performance of contract where contract set forth formula for determining amount of adjustment); *Bar Ray Products, Inc. v. United States*, 162 Ct. Cl. 836, 837-38 (1963) (latent defect not discoverable by ordinary diligence asserted after contract completion); *World Wide Tankers, Inc.*, ASBCA No. 20903, 77-1 BCA ¶ 12,302 (limitations do not begin to run until disputes procedures afforded by contract are exhausted); *Baifield Industries, Div. of A-T-O, Inc.*, ASBCA No. 19025, 75-1 BCA ¶ 11,245 at 53,526 (defective cost or pricing data determined pursuant to contract audit clause within three years after final payment).

While Cubic further suggests that a CO's written validation challenge, by itself, is a government "claim" (app. mot. at 6-8), pursuant to statute, regulation, and contract, it is simply an administrative proceeding by a CO attempting to obtain from a contractor written documentation justifying the contractor's assertion of restrictions on use or release that a contractor is required to maintain by contract (DFARS 252.227-7037(c), (e); 252.227-7019(b)), regulation (DFARS 227.7103-13(b)) and statute (10 U.S.C. § 2321(b)). After receipt of the documentation a contractor submits, a CO may agree with the contractor's assertion of restrictions on use or release by the agency and dispose of the validation challenge in the contractor's favor. DFARS 252.227-7019(f)(iv)(4); 252.227-7037(g)(1). We note the purpose of a validation challenge is not to examine whether a contractor "properly" completed its data rights assertion table appended to the contract, as Cubic appears to suggest (app. mot. at 7, 8; app. reply at 7, 9), but to determine if a proper "restriction" was asserted by Cubic with respect to specific data. The issue is whether Cubic was entitled to assert "limited rights" in the specific data, not whether Cubic erred in listing "mixed funding" upon its data rights assertion table with respect to items it asserted were subject to the "limited rights" restriction. It is conceivable Cubic may have erred in listing "mixed funding" on its assertions table because earlier regulations considered certain costs charged to indirect cost pools as government funding, thereby constituting "mixed funding," not realizing that Congress directed that such funding is now to be considered as funding at "private expense," as discussed above, and therefore be entitled to assert "limited rights" with respect to the data at issue. *See* Nash & Rawicz, *Intellectual Property in Government Contracts* at 511; H.R. Rep. No. 99-1001 at 510-11 (1986 Conf. Rep.) 59 Fed. Reg. 31585, 31608; National Defense Authorization Act for FYs 1988 and 1989, § 808, 101 Stat. 1019, 1128-29 (amounts spent for independent research and development and bid and proposal costs shall not be considered to be government funding for purposes of definition of developed at private expense).

Because we conclude based on the plain language of the parties' 2008 release that claims arising in the future were expressly exempted from that release and the claim of

Cubic regarding validation of its use or release restrictions before us arose after execution of the parties' release, we need not address SPAWAR's assertions that the right to challenge data rights assertions by a contractor is a statutory "right" given to the Secretary of Defense that cannot be waived by a CO. We therefore express no views on either SPAWAR's contention or Cubic's counterargument that it follows from a CO being empowered by the Secretary of Defense to implement a validation challenge that the CO is also empowered to release or waive the DoD Secretary's right to make such challenges. *See generally Exec. Business Media v. DoD*, 3 F.3d 759 (4th Cir. 1983) (Attorney General's plenary power did not include license to agree to settlement that violates civil laws governing agency); *FN Manufacturing, Inc. v. United States*, 42 Fed. Cl. 87, 93 (1998) (while CO may settle contract claims, CO may not "give away" data rights which are not at stake if, in doing so, it subverts goals of CICA); *D&R Machine Co.*, ASBCA No. 50730, 98-1 BCA ¶ 29,462 at 146,236 (parties cannot by agreement override plain dictates of Congress); *Earth Property Services, Inc.*, B-237742, 90-1 Comp. Gen. ¶ 273 (the existence of a settlement agreement does not permit agency to act in ways not otherwise permitted by applicable statutes and regulations).

The standards set forth in FED. R. CIV. P. 56 guide us in resolving the motion for summary judgment in this appeal, which relies on the Rule 4 file. *Dongbuk R&U Engineering Co.*, ASBCA No. 58300, 13 BCA ¶ 35,389 at 173,637; *J.W. Creech, Inc.*, ASBCA Nos. 45317, 45454, 94-1 BCA ¶ 26,459 at 131,661; Board Rule 7(c)(2). We will grant a summary judgment motion only if pleadings, depositions, interrogatory answers, and admissions on file, together with any affidavits or other evidence, show that there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Cubic, the party seeking summary judgment, has the burden of demonstrating both of those elements. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987); *Comptech Corp.*, ASBCA No. 55526, 08-2 BCA ¶ 33,982 at 168,082. SPAWAR, who is the nonmoving party, is entitled to have all reasonable inferences drawn in its favor. *Celotex*, 477 U.S. at 322-24; *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1306 (Fed. Cir. 2000).

Based upon (1) our interpretation of the language of the parties' settlement agreement and release, and (2) the contractual, regulatory and statutory provisions creating and governing procedures for validation of the restrictions asserted by Cubic on use or release, we conclude that the parties' agreement expressly exempted claims arising in the future and that the claim before us concerning validation of restrictions asserted by Cubic on use and release arose after execution of the parties agreement and release. Accordingly, Cubic is not entitled to judgment as a matter of law.

## CONCLUSION

For reasons stated above, we deny Cubic's motion for summary judgment.

Dated:  8 May 2018

TERRENCE S. HARTMAN
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58519, Appeal of Cubic Defense Applications, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals